[Civ. No. 16757. Fourth Dist., Div. One. Apr. 2, 1979.]

JEROME A. LACKNER, as Director, etc., Plaintiff and Appellant, v.
H. A. LAWREN PERKINS et al., Defendants and Respondents.

434

**COUNSEL**

Evelle J. Younger, Attorney General, John J. Klee, Jr., Assistant Attorney General, Anne S. Pressman and James E. Ryan, Deputy Attorneys General, for Plaintiff and Appellant.

Sally Hart Wilson and Karen L. Jones as Amici Curiae on behalf of Plaintiff and Appellant.

Weissburg & Aronson, Peter Aronson and J. Mark Waxman for Defendants and Respondents.

## Opinion

**COLOGNE, J.**—Jerome A. Lackner, M.D., as Director of the State Department of Health (Director) filed a complaint against H. A. Lawren Perkins and The Bradley Sanitarium (Perkins) to collect a civil penalty for alleged violation of the Long-Term Care, Health, Safety and Security Act of 1973 (the Act) (Health & Saf. Code, § 1417 et seq.).[1] Perkins moved for summary judgment, or in the alternative, judgment on the pleadings. The court granted judgment on the pleadings holding the Act unconstitutional by depriving the damaged person of due process. The judgment was amended, however, to state the complaint fails to state facts sufficient to constitute a cause of action on the ground that the Act was unconstitutional in that the penalty scheme set forth in sections 1424 and 1428, subdivision (b), deprives Perkins of due process. The Director appeals.

Perkins is the sole owner of The Bradley Sanitarium, a nursing facility licensed by the State Department of Health pursuant to section 1250 et seq. Authorized representatives of the department entered the premises. and conducted an examination of health care practices. The inspection revealed one patient at the sanitarium had a total of 20 decubiti (bedsores) in various stages of development ranging from recent development to grossly necrotic areas. Sixteen of the sores were draining, two were bleeding and thirteen were necrotic. In addition, the inspection revealed that patient had a flexion contracture of 90 degrees in both knees. All of this was in violation of title 22, California Administrative Code section 72315, subdivision (f).[2]

In addition, it was alleged there were certain violations constituting "B" citations to which no monetary penalty was attached. The records revealed Perkins had (1) no initial plan of care or continuing assessment of the patient's needs (violation of Cal. Admin. Code, tit. 22, § 72311, subd. (a));[3] (2) failed to administer or even order on a timely basis

---

[1] All references are to the Health and Safety Code unless otherwise indicated.

[2] "(f) Each patient shall be given care to prevent decubiti, contractures and deformities, including:

"(1) Changing position of bedfast and chairfast patients *with* preventive skin care as appropriate.

"(2) Encouraging, assisting and training in self-care and activities of daily living.

"(3) Maintaining proper body alignment and joint movement to prevent contractures and deformities."

[3] Title 22, California Administrative Code, section 72311, provides in pertinent part as follows:

"Nursing service shall include, but not be limited to, the following:

"(a) Identification of problems and development of an individual plan of care for each

physician-ordered medication for the patient (violation of Cal. Admin. Code, tit. 22, § 72313, subd. (a));[4] and (3) administered medication to this patient without there having been a physician's order for it (violation of Cal. Admin. Code, tit. 22, § 72313, subd. (g)).[5]

On May 4, 1976, Perkins requested and was granted an informal conference (citation review conference) at which time the "A" and thence "B" citations were considered. Each citation and the proposed $5,000 penalty were affirmed.

On June 3, 1976, pursuant to section 1428, subdivision (a), Perkins notified the department he was contesting the conference decision and the subject complaint was filed by the Attorney General to affirm the citations and penalty. Perkins' motion for judgment on the pleadings granted by the trial court puts in issue the constitutionality of the Act especially insofar as it deals with the penalty scheme.

The Act, subject of our review, was passed by the Legislature with certain objects expressed specifically: "It is the intent of the Legislature in enacting this chapter to establish (1) a citation system for the imposition of prompt and effective civil sanctions against long-term health care facilities in violation of the laws and regulations of this state relating to patient care; (2) an inspection and reporting system to insure that long-term health care facilities are in compliance with state statutes and regulations pertaining to patient care; and (3) a provisional licensing mechanism to insure that full-term licenses are issued only to those long-term health care facilities that meet state standards relating to patient care." (Health & Saf. Code, § 1417.1.)

The citation and penalty system contemplated by the Act is more fully described in section 1424, which reads as follows: "Citations issued pursuant to this chapter shall be classified according to the nature of the

patient based upon initial and continuing assessment of the patient's needs by the nursing staff and other health care professionals."

[4]Title 22, California Administrative Code section 72313, provides in pertinent part as follows:

"Nursing service shall include but not be limited to the following, with respect to the administration of drugs:

"(a) Medications and treatments shall be administered as prescribed and shall be recorded in patient's health records."

[5]Title 22, California Administrative Code section 72313, goes on to provide in subdivision (g): "(g) No medication or treatment shall be given except on the order of a person lawfully authorized to give such order."

violation and shall indicate the classification on the face thereof, as follows:

"(a) Class 'A' violations are violations which the state department determines present an imminent danger to the patients or guests of the long-term health care facility or a substantial probability that death or serious physical harm would result therefrom. A physical condition or one or more practices, means, methods, or operations in use in a long-term health care facility may constitute such a violation. The condition or practice constituting a class 'A' violation shall be abated or eliminated immediately, unless a fixed period of time, as determined by the state department, is required for correction. A class 'A' violation is subject to a civil penalty in an amount not less than one thousand dollars ($1,000) and not exceeding five thousand dollars ($5,000) for each and every violation.

"(b) Class 'B' violations are violations which the state department determines have a direct or immediate relationship to the health, safety, or security of long-term health care facility patients, other than class 'A' violations. A class 'B' violation is subject to a civil penalty in an amount not less than fifty dollars ($50) and not exceeding two hundred fifty dollars ($250) for each and every violation. A citation for a class 'B' violation shall specify the time within which the violation is required to be corrected. If a class 'B' violation is corrected within the time specified, no civil penalty shall be imposed."

After a citation has issued, the licensee may contest its issuance and request an informal conference on the propriety of its issuance. At this time, the Director's designee will hear from the licensee and can affirm, modify, or dismiss the citation or proposed assessment (§ 1428, subd. (a)). If the licensee desires to contest the decision made after this informal conference, he can inform the Director in writing of his intent or he may do nothing, in which case the decision becomes a final order and not subject to further administrative review (§ 1428, subd. (a)). In case of a contest, the matter would then be given to the Attorney General's office for enforcement after trial de novo in superior court (§ 1428, subd. (c)) and the court will assess the actual penalty, if any (§ 1428, subd. (d)).

In lieu of contesting a citation in the manner described, the licensee may send the Department the minimum amount specified by law for each violation, i.e., $1,000 for an "A" citation or $50 for a "B" citation (§ 1428, subd. (b)). This would settle the matter.

■ It is Perkins' position that the presence of the *option* in section 1428, subdivision (b), to pay the minimum penalty for foregoing their due process rights has a "chilling effect" on the exercise of those rights by threatening greater penalty if exercised.

The issue was squarely faced in *Colten v. Kentucky*, 407 U.S. 104 [32 L.Ed.2d 584, 92 S.Ct. 1953]. In that case, the defendant was arrested for disorderly conduct when he failed to leave a congested roadside where a friend in another car was being ticketed. He was tried and convicted in the inferior court and fined $10. Kentucky has a two-tier system for adjudicating certain misdemeanor cases and a defendant has a right to a trial de novo in a court of general criminal jurisdiction, but must risk a greater punishment if convicted. He was tried in the second court, found guilty and fined $50.

In considering the "due process argument," the Supreme Court said: "Our view of the Kentucky two-tier system of administering criminal justice, however, does not lead us to believe, and there is nothing in the record or presented in the briefs to show, that the hazard of being penalized for seeking a new trial, which underlay the holding of *Pearce*,[6] also inheres in the *de novo* trial arrangement. Nor are we convinced that defendants convicted in Kentucky's inferior courts would be deterred from seeking a second trial out of fear of judicial vindictiveness. The possibility of vindictiveness, found to exist in *Pearce*, is not inherent in the Kentucky two-tier system.

"We note first the obvious: that the court which conducted Colten's trial and imposed the final sentence was not the court with whose work Colten was sufficiently dissatisfied to seek a different result on appeal; and it is not the court that is asked to do over what it thought it had already done correctly. Nor is the *de novo* court even asked to find error in another court's work. Rather, the Kentucky court in which Colten had the unrestricted right to have a new trial was merely asked to accord the same trial, under the same rules and procedures, available to defendants whose cases are begun in that court in the first instance. It would also appear that, however understandably a court of general jurisdiction might feel that the defendant who has had a due process trial ought to be satisfied with it, the *de novo* court in the two-tier system is much more likely to reflect the attitude of the Kentucky Court of Appeals in this case

[6]*North Carolina v. Pearce*, 395 U.S. 711 [23 L.Ed.2d 656, 89 S.Ct. 2072] prevents a more severe punishment where there has been a conviction, successful appeal and a reconviction.

when it stated that 'the inferior courts are not designed or equipped to conduct error-free trials, or to insure full recognition of constitutional freedoms. They are courts of convenience, to provide speedy and inexpensive means of disposition of charges of minor offenses.' *Colten* v. *Commonwealth,* 467 S.W.2d, at 379 [Ky. 1971]. We see no reason, and none is offered, to assume that the *de novo* court will deal any more strictly with those who insist on a trial in the superior court after conviction in the Quarterly Court than it would with those defendants whose cases are filed originally in the superior court and who choose to put the State to its proof in a trial subject to constitutional guarantees.

"It may often be that the superior court will impose a punishment more severe than that received from the inferior court. But it no more follows that such a sentence is a vindictive penalty for seeking a superior court trial than that the inferior court imposed a lenient penalty. The trial *de novo* represents a completely fresh determination of guilt or innocence." (*Colten* v. *Commonwealth of Kentucky, supra,* 407 U.S. 104, 116-117 [32 L.Ed.2d 584, 593-594, 92 S.Ct. 1953, 1960-1961].)

The proceedings here in the informal conference are simple and speedy and designed to avoid congestion of the courts. The options available to the licensee are really in the nature of offers of settlement.[7] First they are not binding on him and he has a free choice to accept a minimum fine or go to hearing; or he has a right to pay the fine after the decision or pay the fine assessed by the hearing officer which may be a modified decision; or he may have the whole matter decided by a judge. We view these options as no 'more chilling on the defendant's right to seek a trial than the forfeiture of minimum bail is an option available to the defendant charged with violation of certain vehicle code offenses (see *U. S.* v. *Walters,* 564 F.2d 675). Our case is even less restrictive than *Colten* and similar cases involving criminal statements in that it involves no deprivation of liberty and should pose less of a threat to the due process mandate contained in the Constitution.[8] Moreover, there is no

---

[7] In *Bordenkircher* v. *Hayes* (1978) 434 U.S. 357 [54 L.Ed.2d 604, 98 S.Ct. 663], the court held a plea bargain offer under threat of the prosecution's promise to seek an indictment on more serious charges was not improper.

[8] The proceedings here and the penalty which may be imposed are civil in nature, but Perkins properly points out section 1290 makes certain offenses a misdemeanor: "Any person who violates any of the provisions of this chapter or who willfully or repeatedly violates any rule or regulation promulgated under this chapter is guilty of a misdemeanor and upon conviction thereof shall be punished by a fine not to exceed five hundred dollars ($500) or by imprisonment in the county jail for a period not to exceed 180 days or by both such fine and imprisonment."

Allegations of violations of the Health and Safety Code or "willful and repeated" offenses are not made here.

evidence or history of vindictiveness which would result in prejudice if Perkins seeks a trial de novo. (See *In re Lewallen,* 23 Cal.3d 274 [152 Cal.Rptr. 528, 590 P.2d 383].)

We find no reason to treat the matter any differently under the due process clauses in the California Constitution (Cal. Const., art. I, § 7; art. I, § 15).

The penalty system provided in the Long-Term Care, Health, Safety and Security Act is not an unconstitutional deprivation of due process.

We do not find the Act is unconstitutionally vague nor do we find it provides for an unconstitutional delegation of authority. Since the trial court only ruled on the narrow issue of the due process aspects of the statutory penalty scheme, however, it is unnecessary to elaborate further on constitutional arguments outside the scope of this ruling.

Judgment reversed and remanded for further proceeding consistent with this opinion.

Brown (Gerald), P. J., and Wiener, J., concurred.

A petition for a rehearing was denied April 17, 1979, and respondents' petition for a hearing by the Supreme Court was denied May 30, 1979.