[Civ. No. 44772. First Dist., Div. Four. June 5, 1980.]

JEROME A. LACKNER, as Director, etc.,
Plaintiff, Cross-defendant and Respondent, v.
ST. JOSEPH CONVALESCENT HOSPITAL, INC., Defendant,
Cross-complainant and Appellant.

546

COUNSEL

Orrin Leigh Grover for Defendant, Cross-complainant and Appellant.

George Deukmejian, Attorney General, Robert Willis Walker and John Davidson, Deputy Attorneys General, for Plaintiff, Cross-defendant and Respondent.

OPINION

CALDECOTT, P. J.—The issue presented on this appeal is the constitutionality of the citation and administrative hearing procedure (Health & Saf. Code, §§ 1423-1429)[1] of the Long-Term Care, Health, Safety, and Security Act of 1973 (§§ 1417-1430) (hereinafter the Act). We hold that the procedure is constitutional.

The Act was passed with the express intent (1) to establish a citation system for the imposition of prompt and effective civil sanctions against long-term health care facilities in violation of the laws and regulations relating to patient care; (2) to establish an inspection and reporting system to insure that long-term health care facilities are in compliance with statutes and regulations pertaining to patient care; and (3) to establish a provisional licensing mechanism to insure that full-term licenses are issued only to those long-term health care facilities that meet state standards relating to patient care (§ 1417.1). In furtherance of this intent, section 1424 sets forth two classes of violations:

[1]Unless otherwise indicated, all references will be to the Health and Safety Code.

"(a) Class 'A' violations are violations which the state department determines present an imminent danger to the patients or guests of the long-term health care facility or a substantial probability that death or serious physical harm would result therefrom. A physical condition or one or more practices, means, methods, or operations in use in a long-term health care facility may constitute such a violation. The condition or practice constituting a class 'A' violation shall be abated or eliminated immediately, unless a fixed period of time, as determined by the state department, is required for correction. A class 'A' violation is subject to a civil penalty in an amount not less than one thousand dollars ($1,000) and not exceeding five thousand dollars ($5,000) for each and every violation.

"(b) Class 'B' violations are violations which the state department determines have a direct or immediate relationship to the health, safety, or security of long-term health care facility patients, other than class 'A' violations. A class 'B' violation is subject to a civil penalty in an amount not less than fifty dollars ($50) and not exceeding two hundred fifty dollars ($250) for each and every violation. A citation for a class 'B' violation shall specify the time within which the violation is required to be corrected. If a class 'B' violation is corrected within the time specified, no civil penalty shall be imposed."

Pursuant to section 1426, the Director of the Department of Health (hereafter the Department) was required, upon consultation with industry, professional and consumer groups, to promulgate regulations setting forth the criteria and specific acts constituting class "A" and "B" violations. These regulations may be found in title 22, California Administrative Code,[2] commencing with section 72701.

After a citation has issued, the licensee may contest its issuance and request an informal conference on its propriety. At this time, the director's designee will hear from the licensee and can affirm, modify or dismiss the citation or proposed assessment. If the licensee desires to contest the decision made after this informal conference, he can inform the director in writing of his intent or he may do nothing, in which case the decision becomes a final order and not subject to further administrative review (§ 1428, subd. (a)). In case of a contest, the matter would then be referred to the Attorney General for enforcement by trial

[2]Title 22, California Administrative Code, will be cited hereafter as "regulations" or "Reg."

de novo in the superior court (§ 1428, subd. (c)). The court will assess the actual penalty, if any (§ 1428, subd. (d)). In lieu of contesting a citation in the manner described, the licensee may send the department the minimum amount specified by law for each violation, i.e., $1,000 for an "A" citation and $50 for a "B" citation (§ 1428, subd. (b); Reg., § 72717). The matter would then be settled.

Appellant St. Joseph Convalescent Hospital, Inc. (hereafter St. Joseph) is a skilled nursing facility (§ 1418) licensed by the Department pursuant to section 1250 et seq. On August 8, 1976, the Department received a complaint from the legal guardian of Mr. Nicholas Giras regarding his ward's physical deterioration during his stay at St. Joseph between May 29, 1976, and July 16, 1976. On August 9, 11 and 16, 1976, the Department representatives conducted an examination of Mr. Giras, then a patient at another facility, and investigated his medical history. The examinations and investigation conducted by the representatives revealed that Mr. Giras had developed eight potentially fatal decubitus ulcers (bedsores) in various stages of development ranging in severity from stage I (recent development) to stage IV (grossly necrotic) as well as the deterioration of a coccyx ulcer. This constituted a violation of regulation section 72315, which provides in pertinent part: "(f) Each patient shall be given care to *prevent* decubiti, contractures and deformities, including: (1) Changing position of bedfast and chairfast patients *with* preventive skin care as appropriate." (Italics partly added.)

On August 16, 1976, the authorized representative served on St. Joseph's representative a class A citation pursuant to section 1423. After referring to the pertinent portions of the Administrative Code, the citation stated: "[c]are was not given to prevent decubiti, in that Patient No. 1 developed multiple decubiti ranging in severity from Stage I through Stage IV."

On August 17, 1976, the Department sent St. Joseph an assessment notice proposing a $5,000 civil penalty for the violation.

On August 17, 1976, St. Joseph filed a contest of the citation and proposed penalty, and requested an informal conference. An informal conference was held on September 1 and 20, 1976, resulting in an affirmance by the Department of the original citation and proposed fine. That determination was issued on October 4, 1976.

On October 7, 1976, St. Joseph sent a notice to the Department that it desired to contest the citation in the superior court. The Department, in turn, notified the Attorney General to take appropriate action (§ 1428, subd. (c)).

On January 14, 1977, the Attorney General commenced the present action on behalf of the Department in the superior court to affirm the class A citation and collect the $5,000 civil penalty for the violation. On March 2, 1977, St. Joseph filed an answer denying the allegations of the complaint and setting up the affirmative defenses (1) that plaintiff failed to state a cause of action; (2) that the condition of the patient was not the proximate result of St. Joseph's conduct; and (3) that the informal conference pursuant to section 1428 violated the due process clause of the Constitution. On April 22, 1977, St. Joseph filed an amended answer with affirmative defenses alleging that enforcement of the Act comprised constitutional violations of equal protection and due process.

On June 28, 1977, St. Joseph filed an amended cross-complaint, naming as cross-defendants, four individual Department officers and employees: Jerome A. Lackner, the director; Marion Vought, district administrator of the licensing and certification division for the Berkeley office; Mary Snyder, a health unit supervisor who worked for Marion Vought at Berkeley and supervised the inspection of St. Joseph; Thomas Callahan, district administrator of the licensing and certification division of the San Jose office, who sat as the citation review conference coordinator. The cross-complaint sought injunctive relief and money damages[3] alleging a cause of action based on 42 United States Code, section 1983, contending that each of the named cross-defendants had violated St. Joseph's federal civil rights. Prior to trial, the Department moved for summary judgment on St. Joseph's cross-complaint which was denied "without prejudice." The motion was renewed during trial and was granted by the trial judge.

The trial on the complaint proceeded. On completion of the trial, the judge issued findings of fact and conclusions of law which stated in pertinent part that: "The evidence presented clearly and convincingly established that inadequate patient care was rendered to Nicholas Giras between May 29, 1976, and July 16, 1976. The evidence also established that it was the inadequate patient care provided by defendant

---

[3]The prayer for money damages was withdrawn by St. Joseph at trial.

which proximately caused the ulcers that developed...and which caused the deterioration of the coccyx ulcer that Nicholas Giras had on his return from Eskaton Doctor's Hospital.

"The decubitus ulcers which were caused by defendant's inadequate nursing care resulted in serious physical harm and presented an imminent danger to Nicholas Giras." The conclusions of law provided: "The inadequate patient care provided by defendant to Nicholas Giras constituted a class 'A' violation pursuant to Health and Safety Code section 1424(a).

"The nature and seriousness of said violation is sufficient to warrant imposition of the maximum civil penalty authorized by Health and Safety Code section 1424(a)."

The trial judge issued findings of fact and conclusions of law also with respect to the summary judgment stating inter alia that: "In regard to the cross-complaint filed by defendant, the court concludes: (1) There is no triable issue as to any material fact; and (2) The cross-defendants are entitled to judgment as a matter of law."

Judgment was entered on the complaint affirming and making final the class A citation and assessing a $5,000 civil penalty against St. Joseph Convalescent Hospital, Inc. On the cross-complaint judgment was entered in favor of cross-defendants. The appeal is from the judgment.

The basic thrust of St. Joseph's cross-complaint and answer to the complaint is a challenge to the constitutionality of the Act.

### *The Act Is Not Unconstitutionally Vague*

█ St. Joseph's first claim on appeal is that the definition of the class A offense is unconstitutionally vague. The primary provision attacked by St. Joseph is section 1424, subdivision (a), which defines class A offenses as "violations which the state department determines present an *imminent danger* to the patients or guests of the long-term health care facility or a *substantial probability* that death or *serious physical harm* would result therefrom." (Italics added.) St. Joseph insists that the statutory phrases "imminent danger" and "substantial probability" of death or "serious physical harm" are not sufficiently

definite to provide a fair notice as to the acts forbidden and therefore should be held unconstitutionally vague and ambiguous.

Since the constitutionality of section 1424 is challenged on the grounds of vagueness and uncertainty, by way of introduction we set out the fundamental principles governing the matter. ■ As has been repeatedly emphasized, all presumptions and intendments favor the validity of a statute and mere doubt or difficulty in ascertaining its meaning do not afford sufficient justification to declare it unconstitutional. While a statute should be sufficiently certain so that a person may know what is prohibited thereby, it cannot be held void for uncertainty if its meaning can be objectively ascertained by any reasonable and practical construction. (*American Civil Liberties Union* v. *Board of Education* (1963) 59 Cal.2d 203, 218 [28 Cal.Rptr. 700, 379 P.2d 4]; *Lockheed Aircraft Corp.* v. *Superior Court* (1946) 28 Cal.2d 481, 484 [171 P.2d 21, 166 A.L.R. 701].) As stated in *McMurtry* v. *State Board of Medical Examiners* (1960) 180 Cal.App.2d 760, 767 [4 Cal.Rptr. 910]: "[I]f the words used may be made reasonably certain by reference to the common law, to the legislative history of the statute involved, or to the purpose of that statute, the legislation will be sustained [citations]; and a standard fixed by language which is reasonably certain, judged by the foregoing rules, meets the test of due process 'notwithstanding an element of degree in the definition as to which estimates might differ.' [Citations.]" (Quoting *Connally* v. *General Const. Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126].) "Further, even though all statutes regardless of nature must be sufficiently clear to provide fair notice of prohibited conduct: '"*Reasonable certainty is all that is required. A statute will not be held void for uncertainty if any reasonable and practical construction can be given its language.*" [Citation.] *It will be upheld if its terms may be made reasonably certain by reference to other definable sources.*'" (*Hall* v. *Bureau of Employment Agencies* (1976) 64 Cal.App.3d 482, 494 [138 Cal.Rptr. 725], quoting *American Civil Liberties Union* v. *Board of Education, supra,* 59 Cal.2d 203 at p. 218; *People* v. *Hallner* (1954) 43 Cal.2d 715, 720 [277 P.2d 393].)

■ We believe the statutory phrases under challenge are capable of reasonable and practical interpretation within the foregoing principles and as a consequence they pass constitutional muster.

While standing alone, the phrase "imminent danger" may display some ambiguity, when examined by reference to other definable

sources, it gains a definite meaning. Webster's New International Dictionary, a common source of interpretation, defines the terms as follows: "imminent: threatening to occur immediately, near at hand"; and "danger: exposure or liability to injury, loss, pain, or other evil." Using a common sense, practical construction, "imminent danger" thus means an immediate threat of injury to the patient.

While the phrase regarding "imminent danger" nowhere expressly requires that the danger be "serious," its statutory context demands such interpretation. First, in the hierarchy of violations envisioned by the Legislature, an "A" violation is the most serious. The second phrase in section 1424, subdivision (a), expressly limits "A" violations to cases involving threat of "death or serious physical harm." Sixteen examples of the types of violations which may give rise to "A" citations are described in regulations, section 72703. It is noteworthy that all of the examples, e.g., physical abuse of patients, inadequate isolation procedures, inadequate fire safety measures, improper preparation of medications, relate to violations with potentially serious consequences to patients.

Whether a given set of facts produces an imminent danger of serious harm to patients and guests is a question of fact, as well as one of degree. Both the term "imminent" and the implied requirement of "severity" involve questions of *degree*. Inquiry into "degree" is inherent in any statute which creates a hierarchy of offenses.

The fact that reasonable men may differ in their assessment of *degree* does not render void for vagueness a statute which defines a standard. As stated in *Lorenson* v. *Superior Court* (1950) 35 Cal.2d 49 at page 60 [216 P.2d 859]: "[*A*] *statute is sufficiently certain if it employs words* of long usage or *with a common law meaning, 'notwithstanding an element of degree in the definition* as to which estimates might differ.'... [C]ourts have upheld statutes employing such terms as: 'to make diligent effort to find the owner' [citation]; 'unreasonable speed' [citation]; 'unjustifiable physical pain or mental suffering' [citation]; 'practice law' [citation]; and 'to the annoyance of any other person' [citation]." (Italics added.)

St. Joseph's further argument that the phrases "substantial probability" and "serious physical harm" are vague and lacking in specificity cannot be accepted for two major reasons.

First, the law is replete with instances in which a person must, at his peril, govern his conduct by such exact standards as "reasonable," "prudent," "necessary and proper," "substantial" and the like. Yet, under well settled law, standards of this kind are deemed not impermissibly vague provided their meaning can be objectively ascertained by reference to common experiences of mankind. (*People* v. *Daniels* (1969) 71 Cal.2d 1119, 1128-1129 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677].)

Secondly, and more importantly, the statutory phrases in question do not stand alone, but are further specified and amplified in the regulations. Thus, according to regulations, section 72701: "(1) 'Substantial probability' means that the more likely consequence of a violation is death or serious physical harm to a patient. (2) 'Serious physical harm' means that type of bodily injury in which: (A) A part of the body would be permanently removed, rendered functionally useless, or substantially reduced in capacity, either temporarily or permanently or (B) A part of an internal function of the body would be inhibited in its normal performance to such a degree as to shorten life or cause reduction in physical or mental capacity."

In sum, considering the general legal principles, the regulatory definition and explanation of serious physical harm along with the grievous nature of the injury sustained by the patient in the present case, St. Joseph cannot well complain that it was not put to fair notice of the proscribed conduct or that the statutory regulatory provisions did not sufficiently alert it to the legal consequences of the injuries inflicted on the patient by its substandard care.

We note in passing that *People* v. *Barksdale* (1972) 8 Cal.3d 320 [105 Cal.Rptr. 1, 503 P.2d 257] and *McMurtry* v. *State Board of Medical Examiners, supra,* 180 Cal.App.2d 760, upon which appellant primarily relies, are clearly distinguishable from the case at bench. In both of those cases the statutory language involved conduct which otherwise was not proscribed thus burdening the misfeasant with a new standard of conduct of which he may have been unaware or unsure. In the case at bench, however, no new standard of conduct has been imposed upon the long-term health care facility by the Act, and irrespective of the provisions of the Act, St. Joseph, a licensed health care facility, was already bound by the regulations to provide quality care to the patients.

### The "Minimum Penalty" Provision
### of the Act Is Constitutional

St. Joseph next claims that the minimum penalty provision of the Act (§ 1428, subd. (b)),[4] is unconstitutional. St. Joseph's precise argument is that the statutory option to pay minimum penalty in exchange for abandoning his due process right to trial has a "chilling effect" on the exercise of that right by threatening a greater penalty if convicted after a trial.

The very same issue has been recently addressed and decided by *Lackner* v. *Perkins* (1979) 91 Cal.App.3d 433 [154 Cal.Rptr. 138] (hg. den.). The position taken by *Perkins* is supported by *Colten* v. *Kentucky* (1972) 407 U.S. 104 [32 L.Ed.2d 584, 92 S.Ct. 1953], a United States Supreme Court case heavily relied upon by *Perkins.*

### The Act Does Not Violate Equal
### Protection Standards

■ St. Joseph next argues that the statutory classification which exempts acute care hospitals from the provisions of the Act amounts to a violation of its equal protection rights.

■ Initially, we observe that where, as here, an economic and social welfare legislation is under challenge, the standard of constitutional review is the so-called "rational relationship" test (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 16 [112 Cal.Rptr. 786, 520 P.2d 10]; *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 597 [96 Cal.Rptr. 601, 487 P.2d 1241]). Under this test, the legislation at issue is vested with the presumption of constitutionality and the challenged legislation must be upheld against a constitutional attack if the "statute bear[s] some rational relationship to a conceivable legitimate state purpose." (*Serrano* v. *Priest, supra; In re Antazo* (1970) 3 Cal.3d 100, 110-111

---

[4]Section 1428, subdivision (b) provides that: "A licensee may, in lieu of contesting a citation pursuant to this section, transmit to the department the minimum amount specified by law for each violation within four business days after the issuance of the citation."

Regulations, section 72719, subdivision (a) also sets out that: "If a licensee does not wish to contest a citation, he may transmit to the Department within four business days after the issuance of the citation, the sum of $1,000 for each class 'A' violation and the sum of $50 for each class 'B' violation."

[89 Cal.Rptr. 255, 473 P.2d 999].) ■ The Legislature is vested with wide discretion in making the classification and as long as such classification does not permit one to exercise a privilege while refusing it to another of *like qualifications, under like conditions and circumstances,* it is unassailable on equal protection grounds. (*D'Amico v. Board of Medical Examiners, supra; Blumenthal v. Board of Medical Examiners* (1962) 57 Cal.2d 228, 233 [18 Cal.Rptr. 501, 368 P.2d 101]; *Watson v. Division of Motor Vehicles* (1931) 212 Cal. 279, 284 [298 P. 481].)

■ There is a valid, rational basis for the differing classifications of the acute care hospitals and long-term care facilities and therefore St. Joseph's attack founded on the equal protection clause of the Fourteenth Amendment must fail.

First of all, the regulatory scheme reveals a substantial difference as to the qualification requirements of the staff members and also as to their responsibilities in the two types of health care institutions.

General acute care hospitals are health facilities which have an organized medical staff providing 24-hour inpatient care including the following basic services: medical, nursing, surgical, anesthesia, laboratory, radiology, pharmacy and dietary services. (Reg., § 70005.) A physician has overall responsibility for the medical service in an acute care hospital. (Reg., § 70205.) The nursing service is under the direction of a registered nurse, who, in addition to being registered, holds a master's degree and must satisfy other educational requirements. The director of nurses may not be designated to serve as a charge nurse. Each nursing unit has a registered nurse immediately available at all times. (Reg., § 70215.)

At the same time, skilled nursing facilities (long-term care facilities) such as St. Joseph's, provide 24-hour inpatient care, including the following basic services: medical, nursing, dietary, pharmaceutical, and an activity program. (Reg., § 72095.) There is no requirement in long-term facilities that a physician have overall responsibility for the medical services. The only requirement is that certain physician services be made available to the patients. (Reg., § 72303.) As in acute care facilities, the director of nurses must also be a registered nurse, however, he or she need not possess any advanced degree. Facilities which are licensed for 100 or more beds must have at least one registered nurse awake and on

duty at all times; however, there is no requirement that each nursing unit have a registered nurse immediately available at all times. (Reg., § 72323.)

Furthermore, contrary to St. Joseph's assertion, the care rendered to patients in acute care hospitals differs in both concentration and duration from the care given in skilled nursing facilities. Patients in acute care hospitals very often are hospitalized for only a relatively short period of time, and the treatment of acute ailments demands that the patient be visited by an attending physician once each day. In acute care hospitals, patients are admitted to deal with a particular problem —surgery, disease or serious illness, tests, etc. At the conclusion of the applicable procedures, the patient leaves the hospital.

On the other hand, long-term care facilities perform a vastly different kind of function. These facilities provide extended care, sometimes for years. Their ailments, for example, old age, or a long-term progressive disease, dictate that they do not need the daily care of a physician. Patients are admitted to reside in these facilities. The care and treatment they receive is not necessarily designed to secure their release from the facility. Indeed, in the case of nursing homes, these facilities are generally the last place of residence for the patient.

In summary, the instant legislative classification is designed to assure quality long-term health care for patients who are attended for long periods of time without seeing a physician. The inmates of such institutions are most often old, weak and helpless and are at the mercy of the facility. The Legislature has an important interest in assuring the continuing quality care for these patients and the enforcement system is necessary to attain the above objective. By contrast, in an acute care hospital the treatment of the patients is extensive, thorough and constant. Since the patients in acute care hospitals receive temporary care and are under constant medical surveillance, the need for augmented health inspection and citation is not necessary to assure professional treatment and well being of the patients.[5] Since the classification under challenge has a rational relationship to a legitimate state objective and is predicated on differing conditions and circumstances, it cannot be branded unconstitutional on equal protection grounds.

---

[5]It bears special emphasis that when an acute care hospital has a distinct part which provides long-term health care, that distinct part *is* subject to the citation and civil penalty system. (§ 1418, subd. (a).)

## The Cross-complaint

■ St. Joseph contends that the granting of summary judgment on its cross-complaint was erroneous. It claims that the placing of the citation in the public file amounted to a constructive or figurative posting[6] which injuriously affected its property and liberty interests guaranteed by the Fourteenth Amendment. (42 U.S.C. § 1983; *Board of Regents* v. *Roth* (1972) 408 U.S. 564 [33 L.Ed.2d 548, 92 S.Ct. 2701]; *Wisconsin* v. *Constantineau* (1971) 400 U.S. 433 [27 L.Ed.2d 515, 91 S.Ct. 507].)

■ It is, of course, well recognized that the requirements of procedural due process apply if a person is deprived of property or liberty protected by the Fourteenth Amendment. (*Board of Regents* v. *Roth, supra*, 408 U.S. 564 at p. 569 [33 L.Ed.2d 548 at p. 556]; *C. V. C.* v. *Superior Court* (1973) 29 Cal.App.3d 909, 915 [106 Cal.Rptr. 123].)
■ While the case authorities differ on whether the procedural safeguards of the Fourteenth Amendment come into play in case a person suffers damage to his reputation alone (cf. *Paul* v. *Davis* (1976) 424 U.S. 693 [47 L.Ed.2d 405, 96 S.Ct. 1155] with *Wisconsin* v. *Constantineau, supra*, 400 U.S. 433), it is established beyond any dispute that when injury to reputation is combined with a loss or damage to the property interests of an individual, the compliance with the fundamental precepts of due process becomes imperative. (*Paul* v. *Davis, supra*, 424 U.S. at pp. 709-711 [47 L.Ed.2d at pp. 418-420].)

■ Thus, the crucial issue is not whether the constructive posting of the citation violates St. Joseph's rights but rather whether the statutory and regulatory provisions surrounding the informal conference satisfy the minimum requirements of procedural due process.

■ In determining this vital question, initially we note the essence of procedural due process is that the individual be given adequate notice and a meaningful opportunity to be heard before he can be deprived of a fundamental right. As the United States Supreme Court put it in *Boddie* v. *Connecticut* (1971) 401 U.S. 371, 378-379 [28 L.Ed.2d 113, 119-120, 91 S.Ct. 780]: "Due process does not, of course, require that the defendant in every civil case actually have a hearing on the merits.... What the Constitution does require is 'an *opportunity*...

---

[6]St. Joseph conceded at trial, contrary to the allegation in the cross-complaint, that there is no requirement that the citation be posted at the facility.

granted at a meaningful time and in a meaningful manner' [citation], 'for [a] hearing appropriate to the nature of the case' [citation]. The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings. . . . In short, 'within the limits of practicability,' . . . a State must afford to all individuals a meaningful opportunity to be heard if it is to fulfill the promise of the Due Process Clause." (Italics in original; see also *Stretten* v. *Wadsworth Veterans Hospital* (9th Cir. 1976) 537 F.2d 361, 367; *Skelly* v. *State Personnel Bd.* (1975) 15 Cal. 3d 194, 208-209 [124 Cal.Rptr. 14, 539 P.2d 774]; *C. V. C.* v. *Superior Court, supra,* 29 Cal.App.3d at p. 915.)

■ We believe that the safeguards provided here for the review of the citation by the district administrator or designee do satisfy the elementary requisites of procedural due process. To begin with, the licensee who has received the citation is advised that he has a right to contest the citation and the proposed assessment of penalty therein by requesting an informal conference in the matter within four business days (§ 1428). The regulations at the same time make it clear that the district administrator or his designee who shall hold an informal conference within four days from the receipt of the licensee's request may not automatically approve the citation. Quite to the contrary, the regulations provide a meaningful opportunity for both parties to be heard before the citation is affirmed, modified or dismissed. While the regulations underline that the conference shall be an informal proceeding, that it shall not be conducted in the manner of a judicial hearing, and that the technical rules relating to evidence and witnesses need not be followed, it is expressly provided that "The licensee shall have the right to be represented by legal counsel, to present oral and written evidence or other information on its behalf, and to explain any mitigating circumstances" and that "[t]he representatives of the Department who issued the citation should attend the conference and present whatever evidence or information, oral or written, in substantiation of the alleged violation." (Reg., § 72721, subd. (a)(1), (2).) Since procedural due process does not require a full-fledged trial-type hearing at the preliminary stage in every situation involving a taking of property and since here the licensee is entitled to a de novo court hearing if he loses at the initial stage of contest, the procedural safeguards accorded at the informal conference must be held totally adequate. It follows St. Joseph's contention that the constructive posting violated its Fourteenth Amendment rights for lack of due process must be held unfounded and rejected.

St. Joseph also contends that the motion for summary judgment was previously heard and denied on October 18, 1977, and no new evidence was offered in the trial. It is not clear from the October 19 minutes whether the motion was denied "without prejudice" but in any event, the trial judge did state as a reason for the granting of the motion that the motions of defendants were entitled to judgment as a matter of law. Furthermore, the circumstances had changed at the time the motion was granted. The prayer for damages against cross-defendants had been withdrawn and St. Joseph had conceded that there was no requirement for actual posting. We are unable to find any remaining issue of fact and appellant does not cite any. However, whether an issue of fact exists is immaterial as the theory of the cross-complaint was that the Act was unconstitutional. As we have held to the contrary, the cross-complaint does not state a cause of action and summary judgment was properly granted.

The judgment is affirmed.

Rattigan, J., and Christian, J., concurred.