[No. S056559. Aug. 7, 1997.]

CALIFORNIA ASSOCIATION OF HEALTH FACILITIES, Plaintiff and Appellant, v.
DEPARTMENT OF HEALTH SERVICES, Defendant and Appellant.

286

**COUNSEL**

Foley, Lardner, Weissburg & Aronson, Mark E. Reagan, Jonathon E. Cohn and J. Mark Waxman for Plaintiff and Appellant.

Hunter, Richey, Di Benedetto & Brewer, Sharon K. Sandeen, Hanson, Bridgett, Marcus, Vlahos & Rudy, Paul A. Gordon, Robert L. Rusky and James A. Napoli as Amici Curiae on behalf of Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Charlton G. Holland III, Assistant Attorney General, Jennifer S. Cady and Edward H. Ochoa, Deputy Attorneys General, for Defendant and Appellant.

Bet Tzedek Legal Services, Eric M. Carlson, Houck & Balisok and Russell S. Balisok as Amici Curiae on behalf of Defendant and Appellant.

## OPINION

**MOSK, J.**—Health and Safety Code section 1424[1] provides that long-term health care facility licensees, including operators of nursing homes, may receive citations for violations of state and federal statutes and regulations, and that such citations may include the imposition of civil monetary penalties. Section 1424 also provides that the citation "shall be dismissed" if the licensee proves that despite the fact that the violation occurred, it "did what might reasonably be expected of a long-term health care facility licensee, acting under similar circumstances, to comply with the regulation."

We are now called upon to construe the meaning of this part of the statute, which we will designate the "reasonable licensee defense." Plaintiff, the California Association of Health Facilities (CAHF), an association representing the licensees of nursing homes and other long-term health care facilities, contends that the reasonable licensee defense was intended to relieve licensees of vicarious liability for their employees. The Department of Health Services (Department), the agency charged with enforcing patient care regulations in long-term health care facilities, contends to the contrary that the reasonable licensee defense does not apply whenever an *employee* who is the agent of a long-term health care facility licensee has acted unreasonably, and that the reasonable licensee defense is intended to preclude not vicarious liability but rather strict liability. We conclude that the Department's position is the correct one.

### I.

The Department is charged with responsibility for the administration and enforcement of the Long-Term Care, Health, Safety, and Security Act of 1973 (the Act) and for the enforcement of the regulations promulgated pursuant to the Act. (Health & Saf. Code, § 1417 et seq.; Cal. Code Regs., tit. 22, § 72001 et seq.)

On August 25, 1993, CAHF filed a complaint for declaratory relief, requesting a declaration of rights and duties arising under the "reasonable

---

[1] All further statutory citations are to the Health and Safety Code, unless otherwise indicated.

licensee defense" set forth in section 1424. There was no particular citation at issue in the case, but merely a request to declare the proper interpretation of the statute. The complaint alleged that the Department's policy was to interpret and enforce the statute so as to improperly hold the licensee liable for the unreasonable actions of its employees, and that such policy was contrary to its statutory authority under the Act.

Both parties filed motions for summary judgment. The trial court denied both motions and dismissed CAHF's complaint pursuant to Code of Civil Procedure section 1061[2] because the action did not present an actual controversy and was therefore not justiciable. The Department initially supported the trial court's position, but CAHF appealed. In an unpublished decision, the Court of Appeal held that declaratory relief was in fact appropriate, and that the trial court had abused its discretion by dismissing the claim. The cause was remanded to the trial court for determination on the merits.

On remand, the trial court granted CAHF's motion for summary judgment and issued the following declaratory relief order: "When a citation is issued against a licensee for conduct which does not involve unreasonable conduct of an employee of the institution, the reasonable conduct defense clearly applies. When a citation is issued for the conduct of an employee which is unreasonable and the conduct of the institution is otherwise in all aspects reasonable, the statute requires that the citation be dismissed when the following conditions are present: (1) The conduct involved must not be so outrageous, so heinous, that it must, as a matter of law, be imputed to the licensee. (For example, if an employee murdered numerous patients, etc.) (2) The conduct in question must be by a primary caregiver. (3) The primary caregiver involved must not be a management employee." The Department filed a timely notice of appeal and CAHF subsequently filed a notice of cross-appeal.

The Court of Appeal modified the judgment and affirmed it as so modified. It agreed with the trial court that the reasonable licensee defense does not impose on a licensee vicarious liability for its employees, and that the unreasonable conduct of an employee is not to be imputed to the licensee unless the licensee has done something that itself is unreasonable. But it disagreed with the trial court inasmuch as it placed the three conditions enumerated above on the licensee's ability to assert the reasonable licensee defense. It concluded that such categorical conditions were unwarranted, and

---

[2]Code of Civil Procedure section 1061 provides that "The court may refuse to exercise the power [to grant declaratory relief] in any case where its declaration or determination is not necessary or proper at the time under all the circumstances."

that the reasonableness of the licensee is a factual question that must be determined from the totality of the circumstances in each case. We granted review to determine the meaning of the reasonable licensee defense.[3]

## II.

### A.

In order to interpret the meaning of the reasonable licensee defense, we must first understand the nature of the statutory scheme of which that defense is part. As discussed, section 1424 is one section of the Act. The declared legislative intent of the Act is to "establish (1) a citation system for imposition of prompt and effective civil sanctions against long-term health care facilities in violation of the laws and regulations of this state . . . relating to patient care; (2) an inspection and reporting system to ensure that long-term health care facilities are in compliance with state statutes and regulations pertaining to patient care; and (3) a provisional licensing mechanism to ensure that full-term licenses are issued only to those long-term health care facilities that meet state standards relating to patient care." (§ 1417.1.) The Act covers skilled nursing facilities as well as intermediate care facilities of various types. (§ 1418.)

We summarized the licensing enforcement regime under the Act in *Kizer* v. *County of San Mateo* (1991) 53 Cal.3d 139, 142 [279 Cal.Rptr. 318, 806 P.2d 1353]: "Licensed health care facilities must demonstrate an ability to comply with statutory requirements. (See, generally, § 1250 et seq.) The Act authorizes the Department to inspect such facilities for compliance with statutes and regulations on patient care and to issue citations to noncomplying facilities. (§§ 1421, 1423; *Myers* v. *Eastwood Care Center, Inc.* (1982) 31

---

[3]In deciding the merits of this case, we express no opinion as to whether the Court of Appeal was correct in its earlier holding that this matter is justiciable, and that the trial court had abused its discretion in deciding the contrary. We note that, generally, we will not decide the correctness of an administrative agency's construction of a statute unless the party requesting relief has been cited or in some way concretely penalized by the agency based on that purportedly erroneous construction. (See generally, *People* ex rel. *Lynch* v. *Superior Court* (1970) 1 Cal.3d 910 [83 Cal.Rptr. 670, 464 P.2d 126].) No actual citation is at issue here.

However, even if the Court of Appeal's earlier decision on justiciability is debatable, we nonetheless proceed to the merits for two reasons. First, the earlier decision of the Court of Appeal has become the law of the case. (See *Gore* v. *Bingaman* (1942) 20 Cal.2d 118, 121-122 [124 P.2d 17].) Second, although we may not be necessarily bound by earlier Court of Appeal decisions regarding justiciability, the parties have litigated the underlying issue for over two years in reliance on the Court of Appeal's decision, and we see little reason, in light of the public interest in resolving this legal question, to defer its resolution any longer. (See *Pacific Legal Foundation* v. *California Coastal Com.* (1982) 33 Cal.3d 158, 170 [188 Cal.Rptr. 104, 655 P.2d 306].)

Cal.3d 628, 631 [183 Cal.Rptr. 386, 645 P.2d 1218]; *Lackner* v. *St. Joseph Convalescent Hospital, Inc.* (1980) 106 Cal.App.3d 542, 546 [165 Cal.Rptr. 198].) The Department is authorized to enter any facility for inspection (§ 1421), and must inspect every facility at least once every two years (§ 1422, subd. (b)) or upon receipt of a complaint (§§ 1419, 1420). When the Department observes a violation of a statute or regulation, it issues a citation to the facility. (§ 1423.) Citations are classified according to the seriousness of the violation, and a penalty range is prescribed for each class.

"Among the criteria that define a class AA violation, the most serious class, is a determination by the Department that the violation was a 'direct proximate cause of death of a patient.' (§ 1424, subd. (b).) The penalty for a class AA violation is not less than $5,000 and not more than $25,000. (*Ibid.*) Class A violations are those that present either an imminent danger or a substantial probability that death or serious harm to patients would result. The penalty for a class A violation is not less than $1,000 and not more than $10,000. (§ 1424, subd. (c).) Class B violations are violations that 'have a direct or immediate relationship to the health, safety, or security of . . . patients, other than class "AA" or "A" violations.' The penalty for a class B violation is not less than $100 and not more than $1,000. (§ 1424, subd. (d).) Failure to correct a violation within a specified time may result in an additional penalty of $50 for each day that the deficiency continues. (§ 1425.) Repeated violations may result in a trebling of the penalty assessed. (§ 1428, subd. [(h)].)"

When determining the amount of the civil penalty, the Department is directed to consider, inter alia, "the good faith efforts exercised by the facility to prevent the violation from occurring" and "the licensee's history of compliance with regulations." (§ 1424, subd. (a)(4), (5).) Moreover, no citation is to issue from a violation of the regulations if the "violation was not willful and resulted in no actual harm to any patient or guest" and if certain other conditions were also met. (§ 1424.1, subd. (a)(2).)

The Department's regulations, promulgated pursuant to statute (§ 1275), mandate many specific duties that the licensee is ultimately responsible for performing. For example, the regulations relating to skilled nursing facilities include 12 regulations specifically entitled, "Nursing Service." (Cal. Code Regs., tit. 22, § 72309 et seq.) Many of these regulations contain multiple nursing duties to be regularly performed in skilled nursing facilities. For example, California Code of Regulations, title 22, section 72315 is entitled, "Nursing Service—Patient Care," and contains numerous duties performed

by nursing staff, including treating each patient with dignity and respect; providing each patient with good hygiene, such as care of skin, grooming of hair, and cutting of fingernails; providing clean dry skin free of feces and urine; and regularly changing bed linen. The nursing care regulations relating to skilled nursing facilities contain over 80 duties for nurses to perform. Each of these duties, if not properly performed by nursing staff, can separately result in a civil citation. Violation of these regulations may also be grounds for suspension or revocation of the license. (§ 1411.)

## B.

Before construing the meaning of the reasonable licensee defense, it is helpful to understand its historical background. The reasonable licensee defense was first added to the statutory scheme in the 1985 amendments to the Act. Before that, no statute provided that the reasonableness of the licensee's actions would affect the penalty it received for violations of regulations promulgated pursuant to the Act. (See Stats. 1973, ch. 1057, § 1, p. 2090.) The 1985 amendments were the culmination of a legislative effort made in response to the findings of the "Little Hoover" Commission's 1983 report, The Bureaucracy of Care. The commission found, inter alia, that regulations for long-term health care facilities were not being strictly enforced and that maximum fines for violations of regulations should be raised to encourage compliance with the regulations. (Com. on Cal. State Government Organization and Economy, The Bureaucracy of Care (1983) at pp. 128-129 (Bureaucracy of Care).) As a result, the range of penalty for class A and class B violations was increased to the present range described above, and a new classification at a higher penalty range, class AA violations, was created for a violation that led to a patient's death. Under the 1985 amendments, the reasonable licensee defense applied only to this newly created class AA violation, and provided only that, if the licensee proved the defense, "the citation may be reduced." (Stats. 1985, ch. 11, § 9, p. 44.)

In 1987 the statutory scheme was again amended, and the reasonable licensee defense was extended to class A and B citations. The defense was also expanded to provide that if the licensee sustained its burden, the citation "may be reduced or dismissed." (Stats. 1987, ch. 1141, § 1, pp. 4040-4041.) The 1987 amendments also contained a sunset provision which repealed the defense as of January 1, 1991, and, in conjunction with this provision, required the Department to report to the Legislature by January 1, 1990, on the impact of the expansion of the defense. The purpose of the report was to ensure that the expansion of the defense "shall only be allowed to continue

if the changes do not result in the public's interest being harmed. In evaluating the public's interest, consideration shall be given to the imposition of an undue burden on the regulatory enforcement process, such as creating inordinate delays in processing enforcement actions, requiring the use of excessive departmental staff time or resources for contesting appeals and civil actions, and the reasonableness and fairness of the regulatory enforcement process." (Stats. 1987, ch. 1141, § 4, p. 4046.)

In response to this legislative mandate, the Department prepared a 1990 report entitled Report to the Legislature on the Impact of Reasonable Defense Claims Relating to Long-Term Health Care Facilities (Report to the Legislature). The report found that, of the 3,781 citations issued by the Department in the 2 years since the 1987 amendments went into effect, only 85 reasonable licensee defense claims were raised by facilities, and the Department found the reasonable licensee defense applicable in only 7 cases—less than one-fourth of 1 percent of the total number of citations— each of which led to a reduction or dismissal of the penalty. (Report to the Legislature, *supra*, at p. 26.) The Department, comparing enforcement statistics before and after the 1987 amendments, concluded that there had been no significant changes in its enforcement burdens which would result in the public's interest being harmed. (*Id.* at pp. 4, 28.) Following issuance of the report, the Legislature passed Assembly Bill No. 3432, 1989-1990 Regular Session, an urgency statute that retained the reasonable licensee defense for all classes of citations. (Stats. 1990, ch. 162, § 1, pp. 1234-1235.)

In 1992, the Legislature again amended the Act. The main focus of the 1992 amendments was section 1428, which provides a system for the enforcement and contest of citations and civil penalties. The previous system had required the Attorney General to go to court to enforce citations. (Stats. 1973, ch. 1057, § 1, pp. 2091-2092.) Pursuant to the 1992 amendments, the burden was placed on licensees to contest the validity of citations, by initiating proceedings in superior or municipal court or, in the case of class B citations, by obtaining review before an administrative law judge. In addition to streamlining the citation enforcement process, the 1992 statute also amended section 1424, subdivisions (b), (c), and (d), to provide that, if the licensee carried its burden of proving a reasonable licensee defense, the citation "shall be dismissed." (Stats. 1992, ch. 1163, § 5.) The 1992 amendments did not otherwise alter the language of the reasonable licensee defense. Indeed, except for the changes in language discussed above regarding the consequences of proving a reasonable licensee defense, the language of the defense has remained unchanged since its inception in 1985.

The legislative history sheds no additional light on the precise meaning of the reasonable licensee defense.

With this background in mind, we turn to examination of the statute itself.

### III.

█ Because there is no particular fine in controversy in our case, it is incumbent upon us to define the issue that is the subject of this declaratory relief action with some precision. We review the decision of the Court of Appeal, which held, in granting CAHF's request for declaratory relief, that "[i]n applying the section 1424 reasonableness defense, the Department shall not impute to the licensee the unreasonableness of an employee." In other words, the Court of Appeal held that the licensee cannot be held vicariously liable for the misconduct of its employees.[4] Our sole task is to determine whether the Court of Appeal is correct.

█ In construing the statute in question, we first recognize that section 1424 is not essentially penal in nature but remedial. In this respect, we differ from the Court of Appeal, which found the statute to be penal because of the civil penalties imposed. As we have stated: "While the civil penalties may have a punitive or deterrent aspect, their primary purpose is to secure

---

[4]In deciding this question, the Court of Appeal offered the following hypothetical.

"A health care facility licensee did everything it could to prevent the physical abuse of Mr. Patient. It conducted in-service training for its staff, assured that staff members had good records of treating the patients appropriately, and maintained procedures for monitoring potential problems and investigating actual problems. One day, a previously model staff member became frustrated with Mr. Patient and beat him. In proceedings against the licensee, the Department proved a violation of a regulation prohibiting physical abuse.

"Under the Department's interpretation of the reasonableness defense, the licensee must be cited because the employee's actions were unreasonable and the employee's unreasonableness is imputed to the licensee. Under the Association's interpretation, the citation must be dismissed because the licensee, itself, acted reasonably in doing everything it could to prevent the abuse."

In a request for supplemental briefing, we posed an additional hypothetical: "Employee A., a licensed vocational nurse, is one of the nurses in charge of the night shift of Nursing Home N. She had been properly screened when hired, and has been properly trained and supervised by Nursing Home N. Her record of performance has been spotless. She has herself considerable supervisory responsibility over the nurse assistants on her shift. Employee A, on a certain night, administers the wrong medication to one of the patients in her care, leading to serious harm of that patient. In a hearing on a citation for a class 'A' violation, the nursing home licensee asserts a 'reasonable licensee' defense." In supplemental briefing, CAHF affirmed that, under its construction of the reasonable licensee defense, no citation should issue for the nurse's negligence. The Department took the contrary position, contending that the licensee could only assert the defense if the actions of Employee A herself were reasonable.

obedience to statutes and regulations imposed to assure important public policy objectives. [Citations.] The focus of the Act's statutory scheme is *preventative.* Section 1424 protects patients from 'imminent danger' or 'substantial probability' of harm (class A violations) and even from situations having a 'direct and immediate relationship to the health, safety, and security of patients' (class B violations). Under its licensing authority, the Legislature has mandated standards to ensure quality health care. The regulations establish that what the Legislature and the Department are seeking to impose are measures that protect patients from actual harm, and encourage health care facilities to comply with the applicable regulations and thereby *avoid* imposition of the penalties." (*Kizer* v. *County of San Mateo, supra,* 53 Cal.3d at pp. 147-148, original italics.) As a remedial statute, section 1424 is to be liberally construed on behalf of the class of persons it is designed to protect. (*People* ex rel. *Lungren* v. *Superior Court* (1996) 14 Cal.4th 294, 313-314 [58 Cal.Rptr.2d 855, 926 P.2d 1042]; see also *Kizer* v. *Waterman Convalescent Hospital, Inc.* (1992) 10 Cal.App.4th Supp. 8, 15 [13 Cal.Rptr.2d 239] [in the context of a section 1424 citation enforcement proceeding, Department regulations must be "liberally construed to effectuate their purpose"].) We recognize also that section 1424 is designed to protect one of the most vulnerable segments of our population, "nursing care patients . . . who are already disabled by age and infirmity," and hence in need of the safeguards provided by state enforcement of patient care standards. (*Kizer* v. *County of San Mateo, supra,* 53 Cal.3d at p. 150; see also § 1417.)

██ Turning to the meaning of section 1424's reasonable licensee defense, we observe that the statute must be read in light of the well-established rule of nondelegable duties of licensees. The rule, akin to the rule of respondeat superior in tort law,[5] is that " ' "[t]he licensee, if he elects to operate his business through employees[,] must be responsible to the licensing authority for their conduct in the exercise of his license . . . ." By virtue of the ownership of a . . . license such owner has a responsibility to see to it that the license is not used in violation of law.' " (*Ford Dealers Assn.* v. *Department of Motor Vehicles* (1982) 32 Cal.3d 347, 360 [185 Cal.Rptr. 453, 650 P.2d 328] (*Ford Dealers Assn.*).) As we observed: "The settled rule that licensees can be held liable for the acts of their employees comports with the general law governing principal-agent liability. 'An agent represents his principal for all purposes within the scope of his actual or ostensible authority . . . .' " (*Id.* at p. 360, citing Civ. Code, § 2330.)

---

[5]For the sake of doctrinal clarity, we shall in the remainder of this opinion refer to a licensee's liability for its employees in a regulatory enforcement proceeding as the principle of the licensee's "nondelegable duty," and shall reserve the term "respondeat superior" to apply only to an employer's *tort* liability for its employees.

The rule of nondelegable duties for licensees is of common law derivation. (See *Van Arsdale* v. *Hollinger* (1968) 68 Cal.2d 245, 251 [66 Cal.Rptr. 20, 437 P.2d 508], overruled on other grounds by *Privette* v. *Superior Court* (1993) 5 Cal.4th 689 [21 Cal.Rptr.2d 72, 854 P.2d 721] [a nondelegable duty may be imposed by "statute, charter or by common law"].) The essential justification for this rule is one of ensuring accountability of licensees so as to safeguard the public welfare. As was explained in *Camacho* v. *Youde* (1979) 95 Cal.App.3d 161, 164 [157 Cal.Rptr. 26], a case concerning whether the duties of a licensee engaged in the aerial spraying of pesticides could be delegated to an independent contractor: "[T]he objective of an administrative proceeding relating to a possible license suspension is to protect the public; to determine whether a licensee has exercised his privilege in derogation of the public interest . . . . It is necessary for the Department of Food and Agriculture to effectively regulate the dangerous business of pest control. Safety in the application of pesticides must be assured by fixing responsibility with that safety on the licensee." If a licensee were not liable for the actions of his independent contractor, "effective regulation would be impossible. He could contract away the daily operations of his business to independent contractors and become immune to disciplinary action by the licensing authority." The principle that a licensee will be held liable for the acts of its agents is one that has been applied whether the agent is an independent contractor or an employee. (See *Banks* v. *Board of Pharmacy* (1984) 161 Cal.App.3d 708, 713 [207 Cal.Rptr. 835]; *Rob-Mack, Inc.* v. *Department of Motor Vehicles* (1983) 148 Cal.App.3d 793, 797-798 [196 Cal.Rptr. 398]; *Arenstein* v. *California State Bd. of Pharmacy* (1968) 265 Cal.App.2d 179, 192 [71 Cal.Rptr. 357], overruled on another point by *Barber* v. *Long Beach Civil Service Com.* (1996) 45 Cal.App.4th 652 [53 Cal.Rptr.2d 4]; *Randle* v. *Cal. State Bd. of Pharmacy* (1966) 240 Cal.App.2d 254, 261 [49 Cal.Rptr. 485, 17 A.L.R.3d 1398].)

Thus, the doctrine of nondelegable duties for licensees has at least one justification in common with the respondeat superior duty of employers for employees in the field of tort law: the prevention of future harm to the public by giving the licensees strong incentives to ensure that their employees' conduct conforms to law. (See *Mary M.* v. *City of Los Angeles* (1991) 54 Cal.3d 202, 214 [285 Cal.Rptr. 99, 814 P.2d 1341].) Moreover, the imposition of nondelegable duties on licensees is also a recognition of the reality that many entities subject to administrative regulation are, regardless of the precise form of ownership, corporate ones that can only act through their agents and employees. Thus to speak of the "liability of the licensee" without referring to the liability of the licensee's employees and agents would often be a meaningless abstraction and would make the enforcement

of administrative regulations a virtual impossibility. (See *Arenstein* v. *California State Bd. of Pharmacy*, *supra*, 265 Cal.App.2d at p. 193.)

█ As a general rule, "[u]nless expressly provided, statutes should not be interpreted to alter the common law, and should be construed to avoid conflict with common law rules. [Citation.] 'A statute will be construed in light of common law decisions, unless its language " 'clearly and unequivocally discloses an intention to depart from, alter, or abrogate the common-law rule concerning the particular subject matter . . . .' [Citations.]" [Citation.]' " (*Goodman* v. *Zimmerman* (1994) 25 Cal.App.4th 1667, 1676 [32 Cal.Rptr.2d 419].) Accordingly, "[t]here is a presumption that a statute does not, by implication, repeal the common law. [Citation.] Repeal by implication is recognized only where there is no rational basis for harmonizing two potentially conflicting laws." (*People* v. *Zikorus* (1983) 150 Cal.App.3d 324, 330 [197 Cal.Rptr. 509].) █ Thus, the Department's position that the duties of long-term health care licensees are nondelegable under section 1424 is in accord with the common law of licensee liability, and we will presume it to be correct unless the language or evident purpose of the statute manifest a legislative intent to repeal the rule.

We turn then to the language of the statute itself. The portion of section 1424 at issue in this case is found in subdivisions (b), (c), and (d). It provides, as stated above, that if the state meets its burden of proving that a violation occurred, "the licensee shall have the burden of proving that the licensee did what might reasonably be expected of a long-term health care facility licensee, acting under similar circumstances, to comply with the regulation. If the licensee sustains this burden, then the citation shall be dismissed." (*Ibid.*) As both parties acknowledge, the language of this statute is adapted from Evidence Code section 669, subdivision (b)(1). That subdivision provides that a presumption of negligence per se, which arises under subdivision (a) of that provision when a person violates a statute, ordinance, or regulation of a public entity which proximately causes the injury or death to a property or person, may be rebutted by proof that "[t]he person violating the statute, ordinance, or regulation did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law." Evidence Code section 669 preceded the initial enactment of the reasonable licensee defense in 1985 (see Stats. 1967, ch. 650, § 1, p. 2004) and is itself a codification of the common law (see *Alarid* v. *Vanier* (1958) 50 Cal.2d 617, 624 [327 P.2d 897]). It is reasonable to presume that the Legislature, by patterning the reasonable licensee defense on the rebuttable presumption of negligence per se found in Evidence Code section 669, subdivision (b)(1), was aware of judicial interpretations of

the latter section, and did not intend the meaning of the reasonable licensee defense to be contrary to the judicial construction given to the statute after which it was modeled. (See *Kuntz* v. *Kern County Employees' Retirement Assn.* (1976) 64 Cal.App.3d 414, 422 [134 Cal.Rptr. 501].) We turn then to the judicial construction of Evidence Code section 669 preceding the enactment of the reasonable licensee defense to ascertain the compatibility of the latter with the doctrine of nondelegable duties.

It is clear that Evidence Code section 669, subdivision (b)(1), has not been construed to negate or repeal the principle of either nondelegable duty or respondeat superior liability. In *Maloney* v. *Rath* (1968) 69 Cal.2d 442, 444 [71 Cal.Rptr. 897, 445 P.2d 513, 40 A.L.R.3d 1], we considered the case of a party who had caused an accident due to her violation of Vehicle Code section 26453, which provided that all "brakes and component parts thereof shall be maintained . . . in good working order." Although the *Maloney* court considered events that predated the enactment of Evidence Code section 669, it followed the rule enunciated in *Alarid* v. *Vanier, supra,* 50 Cal.2d at page 624, which was subsequently codified verbatim as Evidence Code section 669, subdivision (b)(1). We held in *Maloney* that although the presumption of negligence arising out of Vehicle Code section 26453 was rebuttable on a showing of reasonableness, that duty was nonetheless nondelegable, and therefore the party would be liable for the negligence of her own mechanic in failing to maintain the brakes properly. (*Maloney, supra,* 69 Cal.2d at p. 446.) ▮ As Chief Justice Traynor, writing for the majority, stated: "Unlike strict liability, a nondelegable duty operates, not as a substitute for liability based on negligence, but to assure that when a negligently caused harm occurs, the injured party will be compensated by the person whose activity caused the harm and who may therefore properly be held liable for the negligence of his agent, whether his agent was an employee or an independent contractor." (*Ibid.*) Similarly, the Evidence Code section 669, subdivision (b)(1), "reasonableness" defense has been assumed not to negate respondeat superior liability. (See *Grant* v. *Petronella* (1975) 50 Cal.App.3d 281, 288-289 [123 Cal.Rptr. 399] [question of county's liability for traffic accident after its employee's violation of speed limit turns on whether *employee* can successfully invoke Evidence Code section 669, subdivision (b)(1)'s reasonableness defense].)

▮ Therefore, the Department argues, just as Evidence Code section 669, subdivision (b)(1), is consistent with the imposition of nondelegable duties on one asserting that provision as a defense to negligence per se, so the reasonable licensee defense in Health and Safety Code section 1424, subdivisions (b), (c), and (d), which uses virtually identical language, should

be understood to be consistent with the common law rule that licensees are responsible for the acts and omissions of their agents. It contends that the reasonable licensee defense was intended to repeal the rule previously in force that long-term health care facility licensees are strictly or absolutely liable for any violations of statutes or regulations. (See Stats. 1973, ch. 1057, § 1, p. 2090; see also *Beach* v. *Western Medical Enterprises, Inc.* (1981) 116 Cal.App.3d 153, 159-161 [171 Cal.Rptr. 846] [inquiry regarding section 1424 liability for class A violations prior to enactment of reasonable license defense limited to whether the violation occurred and whether there was "imminent danger" or "substantial probability" of serious harm to patients as a result].) The defense replaces strict liability essentially with a negligence standard of liability, with the burden on the licensee to prove the lack of negligence. In other words, according to the Department's interpretation, the defense permits the licensee to defend against the imposition of civil penalties not by showing that the licensee reasonably delegated its duties to one of its agents, but rather by showing that the licensee *and* its agents acted reasonably under the circumstances, despite the fact that regulations were violated.

We agree with the Department, particularly after examining the judicial construction of Evidence Code section 669, subdivision (b)(1), that the language of the reasonable licensee defense is fully compatible with the common law rule of nondelegable duties for licensees. We therefore conclude, following the presumption against implied repeal of the common law (*People* v. *Zikorus, supra*, 150 Cal.App.3d at p. 330), that the defense does not repeal or negate that rule.[6]

Although CAHF vigorously opposes this interpretation of the defense, it is somewhat unclear what it proposes in its place. As it implicitly recognizes, the question is not whether the action of a licensee's employees will be imputed to the licensee, but rather *which* actions of *which* employees will be so imputed, since, except in the relatively rare case in which the licensee is an individual personally involved in the day to day operations of the facility, the licensee acts only through its employees. CAHF appears to be proposing that the actions of a certain class of managerial employees, which CAHF refers to as "the licensee's control group," would be attributed to the

---

[6]At oral argument, CAHF argued that our holding in *Kizer* v. *County of San Mateo, supra*, 53 Cal.3d 139, stands for the broad proposition that common law principles are inapplicable to the Act. Its argument is without conceivable basis. In that case we merely held that the civil penalties provided by the Act were not "punitive damages" from which a county health care facility would be immune under Government Code section 818. (53 Cal.3d at pp. 147-148.) We did not consider, much less decide, the question whether common law principles of licensee liability are repealed by the Act.

licensee, but not those of other employees. But CAHF fails to articulate a statutory basis for this distinction. It defines this "control group," following the language of section 72501, subdivision (a) of title 22 of the California Code of Regulations, as those employees with significant responsibility for "organization, management, operation and control of the licensed facility." But the sentence in the regulation following the quoted language provides that "[t]he delegation of any authority by a licensee shall not diminish the responsibilities of such licensee." Moreover, apart from the question whether CAHF's definition of "control group" liability has any basis in statute or regulation, it appears to be both difficult to apply and arbitrary. According to CAHF, a supervising nurse on the night shift of a nursing home, for example, who was in charge of nurse assistants and other employees, would not be considered within the "control group," and there would be no penalty if she administered improper medication to a facility resident as long as the licensee's management had properly screened and supervised her.

The CAHF's interpretation of the statute would give rise to incongruous results. Suppose, for example, a licensee consisted of a partnership of a dozen people who owned a small nursing home and who personally performed all of its functions, including administration, nursing care, etc. If one of the licensees, acting as a nurse, or a nurse assistant, recklessly abused a patient, then CAHF concedes the licensee would be liable for the citation and would not be able to invoke the reasonable licensee defense. But if one of the original licensees decided to no longer participate in the direct operation of the nursing home, and an employee who is not part of the partnership was hired in his place, and that employee committed the same reckless acts, then CAHF asserts that the licensee would not be liable because the employee was not in the "control group."

We are aware of no licensing scheme that makes any such distinctions between "control group" and "non-control-group" employees, nor is any such distinction implicit in the language of section 1424. As we have seen, the common law doctrine of nondelegable duty evolved in part as a solution to the problem of the regulatory accountability of licensees, particularly when the licensees are corporate entities. Because the language of section 1424 does not expressly repeal the common law, we presume the Legislature did not intend to delegate to the courts the task of creating a rule of licensee-employee liability alternative to the common law one, a task that would involve, inherently, the making of essentially legislative distinctions regarding which employees' actions and omissions are to be imputed to the licensee. Indeed, the trial court's attempt to create, out of whole cloth, an alternative regime of liability, holding the licensee liable for the actions of

"management" employees who are not "primary caregivers" and for "heinous" actions, illustrates the essentially legislative nature of the task. We decline to engage in such an endeavor without express statutory authorization. Nor can we take the approach of the Court of Appeal and simply leave the question of the reasonableness of the licensee to the trier of fact, for such an approach begs the legal question of *who* is to be considered "the licensee." Moreover, any such distinctions between liable and nonliable employees seems contrary to the declared intent of the Legislature to establish "a citation system for the imposition of prompt and effective civil sanctions against long-term health care facilities in violation of the laws and regulations of this state . . . relating to patient care." (§ 1417.1.)

Our view that section 1424 does not impliedly supplant common law principles of nondelegable duties is buttressed by section 1432.1. That section, enacted a year before the reasonable licensee defense, provides that "[n]o licensee shall be cited for any violation caused by any person licensed pursuant to the Medical Practice Act [i.e., a licensed physician] if the person is independent of, and not connected with, the licensee and the licensee shows that he or she has exercised reasonable care and diligence in notifying these persons of their duty to the patients in the licensee's long-term health care facility." (*Ibid.*) Thus, when the Legislature sought to limit the regulatory liability of the licensee for the actions of one class of persons, it did so explicitly in section 1432.1. The lack of any such explicit limitation for employee liability in section 1424 gives rise to the inference that no such limitation was intended. Indeed, the exception to liability created by section 1432.1 would not be necessary but for the general rule of licensee liability for its agents.

CAHF claims that a contrary inference arises from section 1430, subdivision (b). That subdivision states in pertinent part: "A resident or patient of a skilled nursing facility . . . may bring a civil action against the licensee of a facility who violates any rights of the resident or patient as set forth in the Patients Bill of Rights in Section 72527 of Title 22 of the California Administrative Code. . . . The licensee shall be liable for the acts of the licensee's employees. The licensee shall be liable for up to five hundred dollars ($500), and for costs and attorney fees . . . ." (*Ibid.*) CAHF contends that if the Legislature had intended in section 1424 to hold the licensee liable for the actions of its employees, it would have done so explicitly, as it did in section 1430, subdivision (b).

Such an inference, however, when subject to greater scrutiny, proves unwarranted. The present version of section 1430, subdivision (b), was

passed in 1982 (Stats. 1982, ch. 1455, § 1, p. 5599), predating the first appearance of the reasonable licensee defense by several years. Prior to the enactment of this statute, there was no private right of action for violation of the patients' bill of rights. Such a private right of action is distinct from the administrative enforcement of the Act with which section 1424 is concerned. The liability of licensees for their employees in a private action under the patients' bill of rights is not governed by common law precedent. In fact, a private suit for a violation of the patients' bill of rights bears more than a passing resemblance to a private suit for the violation of civil rights under the federal Civil Rights Act of 1871 (42 U.S.C. § 1983), and the United States Supreme Court had held a few years before the passage of Health and Safety Code section 1430, subdivision (b), that under United States Code section 1983 a government employer was *not* vicariously liable for its employees. (*Monell* v. *New York City Dept. of Social Services* (1978) 436 U.S. 658, 691 [98 S.Ct. 2018, 2036, 56 L.Ed.2d 611].) By contrast, as discussed, the licensee's liability for its employees' acts and omissions in an administrative enforcement proceeding is supported both by common law precedent and by construction of the statute, Evidence Code section 669, after which the reasonable licensee defense was modeled. Thus, the fact that the Legislature provided explicitly for licensee liability for its employees in Health and Safety Code section 1430, when available common law and statutory precedent did not support such liability, but did not explicitly provide the same in section 1424, when the contrary is true, cannot reasonably give rise to the inference that the Legislature's silence in the latter case was an implied negation of the doctrine of nondelegable duties. The more likely inference, arising, as we have seen, from section 1432.1, is that when the Legislature intends to provide exceptions to the common law rule of nondelegable duties for licensees in the context of administrative enforcement actions, it does so expressly.

CAHF contends that our adoption of the Department's interpretation of the statute will lead to the virtual elimination of the reasonable licensee defense. "If the reasonableness of the licensee conduct was based on an employee's conduct, under the department's interpretation the licensee would virtually always be deemed negligent, resulting in a strict liability standard." But this is plainly not the case—the licensee will still have the opportunity to excuse or justify the violation by evidence that it or its agents acted reasonably in spite of the violation of the regulation. (See *Alarid* v. *Vanier, supra,* 50 Cal.2d at p. 622; *Casey* v. *Russell* (1982) 138 Cal.App.3d 379, 384 [188 Cal.Rptr. 18].) The Department cites the instance of a patient improperly restrained to his wheelchair, when such restraint is necessary to accomplish an emergency evacuation, as one example of a valid assertion of

a reasonable licensee defense. (See also *Huang* v. *Garner* (1984) 157 Cal.App.3d 404, 415-416 [203 Cal.Rptr. 800] [violation of the letter of a regulation may be countered by a showing that a reasonable alternative was adopted].) Nothing before us gives us any reason to believe that the Department's interpretation of the reasonable licensee defense will result in its de facto abolition.

Moreover, assuming that, under the Department's interpretation, the reasonable licensee defense will be applicable in only a relatively small number of cases, we believe that this limited application of the defense is in accord with the intentions of the Legislature disclosed in the legislative history. As discussed above, the reasonable licensee defense was first introduced as part of a package of amendments increasing civil penalties for regulatory violations, after the "Little Hoover" Commission had concluded that regulatory enforcement was not strict enough. (Bureaucracy of Care, *supra*, at pp. 128-129.) When the Legislature expanded the reasonable licensee defense in 1987 to apply to all classes of violations, it provided for the expiration of the defense within three years and mandated that the Department prepare a report on its effects, specifically whether the defense had become a regulatory burden. Only when the Department issued a report concluding that the assertion of the reasonable licensee defense had relatively little impact on its regulatory efforts, and that reasonable licensee defense claims had been upheld in only one-fourth of 1 percent of all citations issued in the two years following the expansion of the defense (see Report to the Legislature, *supra*, at pp. 26, 28), did the Legislature enact the 1990 statute making the defense permanent. (Stats. 1990, ch. 162, § 1, pp. 1234-1235.) In 1992, it is true, the Legislature altered the effect of the defense from discretionary dismissal of the citation or reduction of its penalty to mandatory dismissal. But it did not at that time alter the meaning or broaden the scope of this defense. In short, the Legislature reenacted the reasonable licensee defense in 1990 with the apparent understanding that this defense was being applied in only a handful of cases. Therefore, the legislative history of the reasonable licensee defense is consistent with the Department's narrow interpretation.

CAHF also argues that the purpose of section 1424 is to create incentives for licensees to comply with applicable laws and regulations, and that no purpose would be served by punishing the licensee when the licensee's management has done all that it possibly could to prevent the violation. But a licensee that is liable for its employees will be more likely to exert constant effort to control the conduct of those employees than a licensee that is responsible only for having the proper management policies and procedures in place to control employee conduct, or so the Legislature could

reasonably conclude. (See *People* v. *Balmer* (1961) 196 Cal.App.2d Supp. 874, 877-878 [17 Cal.Rptr. 612] [imposition of criminal liability regardless of mental state for violations of health and safety regulations is justified to protect public].) As noted, the imposition of these strong incentives on the licensee is the primary reason for the common law creation of nondelegable duties for licensees. (See *Camacho* v. *Youde, supra,* 95 Cal.App.3d at p. 164; *Arenstein* v. *California State Bd. of Pharmacy, supra,* 265 Cal.App.2d at pp. 192-193.) Nor does CAHF's interpretation of the reasonable licensee defense accord with the principle that a remedial statute such as section 1424 should be construed broadly to accomplish its protective purpose. (*People* ex rel. *Lungren* v. *Superior Court, supra,* 14 Cal.4th at p. 313.)

CAHF also contends that its interpretation of the reasonable licensee defense would not leave nursing home residents unprotected from the misconduct of individual nursing home employees, because the former would have various private rights of action against the latter, including the action recently created by the enactment of the Abuse of the Elderly and Other Dependent Adults Act, Welfare and Institutions Code section 15600 et seq. For example, Welfare and Institutions Code section 15657 now provides recovery for damages of up to $250,000 as well as costs and attorney fees, when it is proven by "clear and convincing evidence" that a defendant is liable for various forms of elder abuse.

In *Kizer* v. *County of San Mateo, supra,* 53 Cal.3d 139, we rejected a similar argument. There the county claimed that under Government Code section 818 the civil penalties imposed by Health and Safety Code section 1424 did not apply to county-run nursing homes. The county contended that government licensees such as itself would have other incentives, such as " 'the threat of personal injury lawsuits' . . . to ensure compliance." (53 Cal.3d at p. 150.) As we stated: "To suggest, as does the County, that individual patients assume responsibility for enforcement of the Act by way of a 'threat of personal injury lawsuits' . . . is to abrogate the most basic and traditional police power of the state—the oversight of public health and safety. The County's proposed alternatives to the civil penalties would shift the burden of enforcement to those who are most in need of adequate state enforcement, the nursing home patients themselves, who are already disabled by age and infirmity . . . . Relying on the threat of a personal injury lawsuit to impose compliance with health and safety regulations defeats the very purpose of the statutory scheme, i.e., *preventing* injury from occurring. . . . '[b]ecause these patients are "at the mercy of the facility," the inspection, citation, and penalty system established by the Legislature is necessary to assure that they receive quality care.' " (*Ibid.,* original italics.)

The addition of a new statutory private right of action for elder abuse since our opinion in *Kizer* does not change our view that the primary responsibility for enforcing compliance with statutes and regulations governing long-term health care facilities has been given to the Department through its licensing, inspection, and citation regime.[7]

Finally, CAHF argues that the recent holding in *Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291 [48 Cal.Rptr.2d 510, 907 P.2d 358] is an indication of an intent to limit or repudiate the doctrine of vicarious liability and nondelegable duties. This is not the case. In *Lisa M.* a majority of the court declined to hold a health care provider vicariously liable in tort for a sexual assault by an employee on a female patient during an ultrasound examination. The court simply applied to an unusual set of facts the well-established rule that an employer is not vicariously liable for employee actions that occur outside "the scope of employment," in other words, for those actions that are " 'so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.' " (*Lisa M., supra,* 12 Cal.4th at p. 299.) Nothing in *Lisa M.* indicates a retreat from the rule of nondelegable duties for licensees.

We have suggested that there may be a limitation on the doctrine of nondelegable duties for licensees similar to that found in tort law. In *Ford Dealers Assn.,* while upholding a regulation making automobile dealer licensees liable for the misrepresentations of their sales representative, we stated in dictum that there might be an exception to such a rule of liability under "unusual circumstances" that negate the presumption that the employer had the capacity to control the salesperson. (See *Ford Dealers Assn., supra,* 32 Cal.3d at p. 361, fn. 8.) We declined to elaborate on this exception "[i]n the absence of a specific factual setting raising the question . . . ." (*Ibid.*) Although formulated somewhat differently and only suggested in outline, the *Ford Dealers Assn.* court appeared to suggest an exception to the rule of nondelegable duty akin to the "scope of employment" exception to the rule of respondeat superior liability. Whether and to what extent such an exception applies in this or any other regulatory context is a matter that we also decline to address "[i]n the absence of a specific factual setting raising

[7]CAHF also points to various federal enforcement mechanisms for long-term health care facilities, particularly the Health Care Financing Administration's (HCFA) regulations, effective July 1, 1995, which allow the HCFA to impose a variety of remedies, including denial of payment for new admissions, civil monetary penalties, and closure of the facility if the facility falls out of "substantial compliance" with the regulations. (42 C.F.R. §§ 488.301, 488.406 (1996).) Yet nowhere is it suggested, either in the federal regulations or in CAHF's brief, that these federal enforcement mechanisms are intended, or able, to take the place of the Department as the primary enforcer of standards of care in the long-term health care facilities of this state.

the question . . . ." (*Ibid.*) We merely hold that the Court of Appeal's conclusion that "[i]n applying the section 1424 reasonableness defense, the Department shall not impute to the licensee the unreasonableness of an employee," is, as a rule, erroneous.

## IV.

The judgment of the Court of Appeal is reversed and remanded with directions to reverse the judgment of the superior court granting CAHF's request for declaratory relief.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.