840 So.2d 309 (2003)
NME PROPERTIES, INC., Appellant,
v.
Florence RUDICH, as Personal Representative of the Estate of Ida Revitz, deceased, Appellee.
No. 4D00-4490.
District Court of Appeal of Florida, Fourth District.
February 12, 2003.
Rehearing Denied April 9, 2003.
Susan M. Seigle of Ruden, McClosky, Smith, Schuster & Russell, P.A., West Palm Beach, for appellant.
*310 Philip M. Burlington of Caruso, Burlington, Bohn & Compiani, P.A., West Palm Beach, and Dan Cytryn of the Law Offices of Dan Cytryn, P.A., Tamarac, for appellee.
SHAHOOD, J.
We affirm the punitive damage award against NME Properties, Inc., d/b/a Menorah House, following the death of Ida Revitz, a Menorah House resident, based on vicarious liability. Likewise, we also affirm all other issues raised on appeal and cross-appeal, but write to address the nondelegable duty of a nursing home licensee to provide adequate care to its residents, even though the nursing home was operated by an independent contractor.

Facts
Appellee, Florence Rudich, as Personal Representative of the Estate of Ida Revitz, Deceased, filed a six-count second amended complaint against appellant, NME Properties, Inc. d/b/a Menorah House, and others, including Dr. Aaron, following the death of Revitz. Rudich alleged in count I, a violation of Chapter 400, Florida Statutes (The Florida Nursing Home Residents' Rights Act), not resulting in death; count II, a violation of Chapter 400, Florida Statutes, resulting in death; count III, negligence; count IV, medical negligence against Menorah House; count V, wrongful death; and count VI, medical negligence against Dr. Aaron.[1] In addition, appellee was permitted to include a prayer for punitive damages.
NME Properties, Inc. (NME), a Delaware corporation, was licensed by the State of Florida to operate a nursing home, and owned and operated Menorah House, located in Boca Raton, Florida. Revitz was a resident of Menorah House from July 1992 until January 1995, when she was discharged to North Broward Medical Center and subsequently to Hospice where she died in February 1995. The death certificate listed the primary cause of death to be acute bronchopneumonia secondary to decubitus ulcers.[2]
At the time of her admission in July 1992, Revitz was in the middle phase of Parkinson's Disease, incontinent of bowel and bladder, had moderate to severe dementia, memory problems and limited mobility. She was totally dependent on Menorah House personnel for mobility, toilet needs, and bathing.
Menorah House had written policies and procedures on the care and monitoring of decubitus ulcers, which included record keeping requirements regarding treatment and status of the ulcer as well as notifying a physician and the Director of Nursing. The treatment nurse, who performed treatments and dressing changes for the residents, was responsible for filling out pressure ulcer reports and documenting residents' decubitus ulcers; those reports were not contained in the residents' charts. Menorah House's Director of Nursing testified that it was the nursing home's responsibility and its staff to provide the *311 residents with the appropriate observation, assessment, nursing diagnosis, planning, intervention and evaluation of care. She agreed that if decubitus ulcers were not treated, they would worsen.
After suffering an 11-pound weight loss and a brief admission to the hospital where tests suggested colon cancer, Revitz was readmitted to Menorah House on October 17, 1994. At that time, Revitz did not have any decubitus ulcers or pressure sores on her body.
Records indicate that from December 16 through December 26, 1994, Revitz was not bathed or showered, even though the same was required on a daily basis. On December 24, Desitin was applied to Revitz's right hip and buttocks and was to be applied on a daily basis until the area was healed. Such treatment is commonly used for redness commonly associated with incontinent residents. On December 29, Revitz acquired a Stage Two decubitus ulcer on her coccyx, approximately two centimeters in size. A Ferris Polymer gel-filled pad was applied to Revitz's right hip; however, no physician's order was entered for such treatment. Although a Stage Two decubitus ulcer required that a doctor be notified, a doctor was not notified of the ulcer until January 9, 1995. No treatment was provided for the decubitus ulcer at the time it was discovered. Revitz's chart did not contain any updates on the status of the decubitus ulcer on Revitz's coccyx or hip. A January 2, 1995 pressure ulcer report stated that the decubitus ulcer on Revitz's coccyx was acquired on December 29, 1994, however, the nurses' notes made no mention of it until January 9, 1995. The treatment nurse did not obtain a separate order for treatment of the coccyx ulcer, but claimed that she must have used the order written for the right hip. By January 9, the nurses' notes described the decubitus ulcer as a Stage Four ulcer, 4½ × 5 centimeters in size, foul-smelling, with black edges. A pressure ulcer report of that same date reflected a 3 centimeter, Stage Three ulcer. At that time, Dr. Aaron was contacted and he prescribed a cleansing treatment for the coccyx and hip. This was the first record of any treatment for the decubitus ulcer on the hip. A decubitus ulcer on Revitz's left hip was first noted in a pressure ulcer report on January 16. By that time, the ulcers had not improved and saline as a cleaner was prescribed. By January 24, the coccyx decubitus ulcer was 8 × 4 centimeters and the left hip decubitus ulcer was 4 centimeters. Rudich was not notified of her mother's ulcers until January 24 when Revitz was discharged from Menorah House and taken to the hospital. Once at the hospital, Dr. Aaron recommended a plastic surgeon regarding the ulcers or a Hospice consult. Revitz was discharged to Hospice where she later died on February 4, 1995.
Dr. Vinger, appellee's expert, testified that Revitz required daily skin examinations and that the absence of any documentation from January 2 to January 9 and the failure to contact the attending physician was a violation of both state and federal standards. He opined that Revitz needed to be turned and repositioned and to be given appropriate pressure relief in order to prevent the development of the coccyx decubitus ulcer. In January 1995, there was no documentation that Revitz had been turned and repositioned for thirty of seventy shifts, nor was there evidence that she had been changed regularly, despite her incontinent condition. During the time in which Revitz had Stage Three and Stage Four ulcers, Dr. Aaron was never notified by the staff that on several occasions, Revitz did not ingest the antibiotic prescribed by him. Further, no pain medication for her decubitus ulcers was administered. In addition to these glaring errors, charting entries indicated *312 that Revitz, with her advanced stage of decubitus ulcers, was showered on January 21 and was bathed on January 27; Revitz had been admitted to the hospital on January 24.
The jury returned a verdict finding both Menorah House (80%) and Dr. Aaron (20%) negligent, but that such negligence did not result in her death. The jury assessed damages in the amount of $9,920.00 in medical expenses, $150,000 for pain and suffering, and a punitive damage award against NME in the amount of $800,000.

Summary Judgment Motion
Post-trial, NME moved to set aside the verdict for punitive damages arguing that the trial court erred in denying its motion for summary judgment on the punitive damage claim. In its motion for summary judgment, NME claimed that under a management agreement with First Healthcare Corporation (First Healthcare), an independent contractor, NME had no responsibility for hiring, firing, and daily management functions, and therefore, could not be liable for punitive damages arising from the conduct of First Healthcare's employees. While NME conceded liability for compensatory damages for the acts and or omission of the nurses and nurses' aides, it disputed the imposition of punitive damages.
In support of its motion, NME relied upon Timothy Pullen, Vice President of Tenet Healthcare, the parent corporation for NME. Pullen, through deposition, testified that NME owned the assets of Menorah House,[3] and that NME, then known as Hillhaven, Inc., entered into a management agreement with First Healthcare in 1990 to provide management services to Menorah House. Pullen claimed that during the relevant periods from October 1994 through January 1995, none of the parent companies, National Medical Enterprises, Inc., NME Property Corporation or NME Property Holding Co., hired or fired employees of Menorah House, paid wages and salaries, or exerted any control over the conduct of the employees at Menorah House. Rather, First Healthcare managed those functions.
NME argued that punitive damages should not be imposed vicariously against a licensee who operates a nursing home through an independent contractor. This, NME claims, would extend the holding of Mercury Motors Express v. Smith, 393 So.2d 545 (Fla.1981), which held that before an employer may be held vicariously liable for punitive damages under the doctrine of respondeat superior, there must be some fault on his part since punitive damages are imposed only as a punishment of the defendant and as a deterrent to others. See id. at 549. Following a hearing, the trial court denied appellant's motion for summary judgment.

Analysis
We affirm the trial court's denial of the motion for summary judgment and hold that NME is liable for punitive damages based upon vicarious liability. At all times material hereto, NME admitted that it was a licensee as defined by the Florida Administrative Code and was licensed by the State of Florida to operate a nursing home and owned and operated a nursing home under the name of Menorah House. NME cannot escape its contractual liability by delegating performance under a contract to an independent contractor. The contracting party remains liable for the negligent performance of the contract *313 whether it be performed for him by his employee or an independent contractor. See Irving v. Doctors Hosp. of Lake Worth, Inc., 415 So.2d 55, 59 (Fla. 4th DCA), review denied, 422 So.2d 842 (Fla. 1982).
Nursing home healthcare is controlled by extensive statutes and regulations in this state. See Ch. 400, Fla. Stat. (1995).[4] Florida Administrative Code Rule 59A4-103(4)(a) provides that "[t]he licensee of each nursing home shall have full legal authority and responsibility for the operation of the facility." Such duty is a nondelegable duty such that NME cannot avoid liability by hiring an independent contractor to perform certain tasks. Section 400.23(1), Florida Statutes (1995), provides a cause of action against any licensee responsible for the violation of a resident's rights, including the failure to provide a resident with appropriate observations, assessment, nursing diagnosis, planning, intervention, and evaluation of care by nursing staff. See also § 400.23(3), Fla. Stat. (1995). Said cause of action provides for recovery of actual or punitive damages.
Generally, when an activity can be performed only pursuant to a license or franchise granted by a governmental entity, the licensee or franchisee remains responsible for the performance of the activityno matter who actually performs it. See Hamid v. Metro Limo, Inc., 619 So.2d 321, 322 (Fla. 3d DCA 1993).
In Irving, an action was brought involving the liability of a hospital for the alleged negligent diagnosis and treatment by an emergency room physician that resulted in serious injury. The critical issue at hand was whether the emergency room physician was an employee of the hospital or an independent contractor. The plaintiff requested that certain instructions be given to the jury, arguing that even if the physician was an independent contractor, the hospital could not avoid liability by delegating performance. In so holding, the court applied the Restatement of Torts, which states:
One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.
Irving, 415 So.2d at 61 (quoting Mduba v. Benedictine Hosp., 52 A.D.2d 450, 384 N.Y.S.2d 527, 529 (1976)(quoting Restatement, 2d, Torts, § 429, Comment b)).
In Schropp v. Crown Eurocars, Inc., 654 So.2d 1158, 1159 (Fla.1995), the court set forth the two methods by which a corporation may be held liable for punitive damages:
A review of the case law in Florida reveals two methods have been established by which a corporation may be held liable for punitive damages: (1) vicarious liability based on the willful and malicious actions of an employee with a finding of independent negligent conduct by the corporation; or (2) direct liability based on the willful and malicious actions of managing agents of the corporation.
*314 Under the vicarious liability theory, the court noted that "it is not necessary for the plaintiff to establish that the corporate employer acted with the same heightened culpability as the employee to allow punitive damages. It is sufficient if the plaintiff establishes ordinary negligence on the part of the corporate employer." Id. at 1160; see also Beverly Enters.-Fla., Inc. v. Spilman, 661 So.2d 867, 873 (Fla. 5th DCA 1995), review denied, 668 So.2d 602 (Fla.1996)(vicarious liability required willful and wanton misconduct on the part of the employee and some fault on the part of the employer, not necessarily willful or wanton misconduct which foreseeably contributed to the plaintiff's injury). As to the second method, the acts of the managing agent itself must be willful and malicious to warrant the imposition of punitive damages on the corporation.
In applying the above rationale to the nursing home setting, the California Supreme Court in California Ass'n of Health Facilities v. Department of Health Services, 16 Cal.4th 284, 65 Cal.Rptr.2d 872, 940 P.2d 323 (1997), held that the licensee of a nursing home could not avoid vicarious liability for the conduct of its employees/independent contractors who engaged in the operation of the facility. The court held that the "rule of nondelegable duties of licensees" was akin to the rule of respondeat superior in tort law and that the licensee, if he elects to operate his business through employees, must be responsible to the licensing authority for their conduct in the exercise of his license. See id. at 330. By virtue of the ownership of a license such owner has a responsibility to see to it that the license is not used in violation of law. See id. The court went on to hold that if a licensee were not liable for the actions of his independent contractor, effective regulation would be impossible. See id. The licensee could contract away the daily operations of the business to independent contractors and become immune to disciplinary action by the licensing authority. See id. The principle that a licensee will be held liable for the acts of its agents is one that has been applied whether the agent is an independent contractor or an employee. See id.
In this case, despite NME's assertions to the contrary, the management agreement entered into between First Healthcare and Hillhaven, Inc., now NME, does not insulate NME from liability for First Healthcare's negligence. Because NME had a nondelegable duty to provide the proper care to its nursing home patients, First Healthcare became its managing agent for this purpose.
We reject NME's argument that it could not be considered the employer of the nurses and nurses' aides unless Rudich presented evidence that it interfered with the delivery of care to the extent it assumed detailed direction of that care. Clearly, the management agreement provided NME with a certain degree of control over all decisions made by First Healthcare regarding the nursing home. The agreement does not establish, as a matter of law, that the nurses and nurses' aides at Menorah House were independent contractors for whose tortious conduct NME could not be liable. The management agreement specifically states that NME owns the property upon which Menorah House is located and owns the license to operate and "has the sole right to operate the same." It further provides that First Healthcare as manager shall provide management, consulting, and advisory services to NME in connection with the operation of the facility. First Healthcare's recruitment, selection, employment, training, promotion, and termination of all facility personnel and the establishment of all employee performance standards is "subject to Owner's review and approval." *315 Likewise all operational polices and procedures necessary to establish and maintain the standard of patient care appropriate for the facility developed by First Healthcare was also "subject to the Owner's prior written approval."
Here, the evidence suggests that First Healthcare's own administrators were negligent in supervising the staff, including permitting the facility to be short on staff during holiday periods (when the ulcers on Revitz developed). There was also a pattern of record keeping irregularities which resulted in records being inaccurate or non-existent. That is sufficient to support vicarious liability for punitive damages when combined with the willful conduct of the nursing employees.
Briefly, we note on cross-appeal that under Beverly Enterprises-Florida v. Knowles, 766 So.2d 335 (Fla. 4th DCA 2000)(en banc), review granted, 789 So.2d 346 (Fla.2001), the trial court was required to direct a verdict on count I, a violation of Revitz's statutory rights under section 400.23, not resulting in death. Knowles held that the personal representative of a deceased nursing home resident may bring action against the nursing home for violation of Patient's Bill of Rights only when the deprivation or infringement of the resident's rights caused the patient's death. See id. at 337. Based on Knowles, we affirm the trial court's entry of directed verdict on count I.
AFFIRMED.
STONE and WARNER, JJ., concur.
STONE, J., did not participate in oral argument, but has had the opportunity to review the entire proceedings.
NOTES
[1] This claim was settled prior to trial, but Dr. Aaron's name was included on the verdict form as a "Fabre" defendant.
[2] Decubitus ulcers are a breakdown of the skin caused by excess or constant pressure being applied to the skin and underlying tissue in the area of a bony prominence. This constant pressure decreases the blood supply to the tissues causing them to die and become necrotic. There are four stages of decubitus ulcers: stage one, a redness on the surface of the skin that does not blanch with pressure; stage two, further damage to the skin appearing as an abrasion or blister; stage three, a hole in the skin exposing the underlying tissue or fat; and stage four, a hole in the skin developing into necrotic or dead tissue and fat, exposing bones, muscles and other structural tissue.
[3] At that time, NME was owned by NME Property Holding, Inc. and NME Properties Corp., which was a wholly-owned subsidiary of National Medical Enterprises, Inc. National Medical Enterprises, Inc. later become Tenet Healthcare.
[4] The purpose of this part is to provide for the development, establishment, and enforcement of basic standards for: (1) The health, care, and treatment of persons in nursing homes and related health care facilities; and (2) The maintenance and operation of such institutions that will ensure safe, adequate, and appropriate care, treatment, and health of persons in such facilities. § 400.11, Fla. Stat. (1995).