Filed 11/15/19

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| RSCR INLAND, INC., | |
|       Plaintiff and Appellant, | E067614 |
| v. | (Super.Ct.No. RIC1407237) |
| STATE DEPARTMENT OF PUBLIC HEALTH, | OPINION |
|       Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Gloria Trask, Judge. Affirmed.

Xavier Becerra, Attorney General, Julie Weng-Gutierrez, Assistant Attorney General and Jennifer M. Kim, Kristen T. Dalessio and Malinda Lee, Deputy Attorneys General, for Defendant and Appellant.

Salma E. Enan for Disability Rights California as Amicus Curiae on behalf of Defendant and Appellant.

Davis Wright Tremaine, John R. Tate and Karen A. Henry, for Plaintiff and Appellant.

1

Hooper, Lundy & Bookman, Mark E. Reagan and Stephanie A. Gross for California Association of Health Facilities as Amicus Curiae on behalf of Plaintiff and Appellant.

We address the scope of the "reasonable licensee defense" through which a California long-term health care facility may show that a citation for a regulatory or statutory violation should be dismissed, even though there is a factual basis for the citation. The California Department of Health argues that the defense is available only in the event of an "emergency" or "special circumstances." We reject that view and follow the statutory standard, holding that the facility may succeed in dismissing a citation by demonstrating that it did what might reasonably be expected of a long-term health care facility licensee, acting under similar circumstances, to comply with the regulation or statute that allegedly was violated.

This standard differs from the required showing of due care in a typical negligence case because the facility must show reasonable care directed at complying with the regulation or statute, not reasonable conduct in general. But the standard does not require an emergency or an unusual circumstance. Applying the statutory standard, we conclude that substantial evidence supported the trial court's finding that the facility here had established the reasonable licensee defense. Thus, we affirm the judgment.

## I.  FACTS AND PROCEDURAL BACKGROUND[1]

This case arose following the death of Eric, a resident of Chapala House, a single-family residence in Riverside that provides round-the-clock care and support to six residents.[2]  Chapala House is licensed as a "long-term health care facility" under the Long-Term Care, Health, Safety, and Security Act of 1973 (Health and Saf. Code,[3] § 1417 et seq.) (the Act)—more specifically, as an "[i]ntermediate care facility/developmentally disabled habilitative" (ICF/DD-H).[4]  (See § 1418, subd. (a)(4).)

Plaintiff and appellant RSCR Inland, Inc. (ResCare) owns Chapala House. Defendant and appellant State Department of Public Health (the Department) issued a citation and imposed a civil penalty on ResCare in connection with Eric's death, and ResCare brought this lawsuit to challenge the citation and penalty.

Eric was transferred to Chapala House in 2009.  As the result of a car accident, he was largely paralyzed except for a "very limited range of motion and dexterity in his right

---

[1]  The facts from which this case arises are mostly undisputed, although the parties disagree about the legal consequences that flow from them.  We derive our description of the facts largely, though not exclusively, from the trial court's statement of decision.

[2]  We use Eric's first name only to preserve his privacy, following the practice agreed to between the parties and endorsed by Eric's mother.  In the citation issued to ResCare and the trial court's statement of decision, among other places in the record, Eric is sometimes referred to as "Client A."

[3]  Further undesignated statutory references are to the Health and Safety Code.

[4]  The term "long-term health care facility" includes eight types of licensed care facilities.  (§ 1418, subd. (a).)

3

upper extremity," including "pincher dexterity in his right hand." He was therefore "totally dependent on others for activities of daily living." After the accident, he was also diagnosed with "a mild intellectual disability and major depression disorder." At the time of Eric's transfer to Chapala House, he had a history of "maladaptive behaviors," including "(1) self-injurious behavior consisting of placing his fingers in his mouth to induce vomiting, (2) property destruction consisting of throwing objects, and (3) trying to leave his wheelchair unassisted." He also had a history of putting into his mouth, and sometimes swallowing, inedible objects, particularly when he was upset or angry.[5] His medical records note that "from time to time" when Eric was engaging in "maladaptive behaviors" he would make statements "to the effect that 'I want to die.'" But Eric's physicians did not identify him as a "suicide risk," and they did not order any "special measures . . . beyond medication."

At Chapala House, residents were cared for by two "direct care staff members," who were unlicensed but trained caregivers. The direct care staff members were supervised by a Qualified Intellectual Disabilities Professional (QIDP) and a registered

---

[5] The frequency of this behavior is one of the few factual issues that is disputed by the parties. ResCare does not dispute that "on a few prior occasions years earlier" he "put things in his mouth" and that on one occasion, Eric removed the cap of the joystick on his wheelchair and swallowed it. One ResCare employee who took care of Eric, however, testified in her deposition that Eric often would put "[a]nything he could grab" in his mouth, if he was upset or frustrated, including "socks or towels."

nurse (RN), who periodically visited the residence.[6] Chapala House—specifically, the RN—prepared a nursing care plan that addressed Eric's "maladaptive behaviors." The plan provided that when Eric uttered "harmful words . . . during behaviors," staff should, among other things, (1) call the "RN [and QIDP]" as soon as possible and document the behavior, (2) remove all objects around Eric to "avoid harm to [him]self and others," and (3) take various steps to prevent aspiration or choking, including sitting Eric upright or placing him on his side.[7]

In depositions and at trial, the direct care staff members testified that they were not familiar with the nursing care plan. But the RN who prepared the nursing care plan testified that she trained the direct care staff about what was in the nursing care plan and how to comply with it. A ResCare expert witness was willing to "assume" that such

---

[6] The term in use at the time of the events at issue and that appears in our record is "Qualified Mental Retardation Professional" or "QMRP," but we prefer to use the modern terminology.

[7] The portion of the nursing care plan at issue is a form, filled out by hand, that identifies "Utteration of harmful words to others and self during behaviors" as a "Problem/Need" or "Concern." There are eight items listed under the "Plan of Care": (1) "Staff will observe client and identify needs that [precede] his behavior and notify [QIDP] and RN especially with agitation"; (2) "Staff will maturedly [*sic*] and in a soft voice redirect client when he is agitated"; (3) "Staff will encourage client to speak out his needs instead of getting agitated"; (4) "Staff will report to RN & [QIDP] as well as documenting behavior type with com[m]ents of harm (call RM & [QIDP] ASAP)"; (5) "Staff will remove all objects around resident when he has a behavior to avoid harm to self and others"; (6) "Staff will sit resident upright or lay him to his side to prevent any form of aspiration or [choking] during any form of inducing of vomiting during his behavior"; (7) Staff will wipe vomitus and mucus to avoid [choking] and aspiration"; and (8) "Staff will follow all MD orders."

5

training was performed, and that the direct care staff members had been made aware of the contents of the nursing care plan, whether or not they had actually seen the document, because the staff had implemented many (even if not all) aspects of the plan. She explained that typically staff members are not given a copy of the nursing care plan because of privacy concerns, but that instead they are trained to implement its contents through discussions.[8]

Eric also had "behavior plans" addressing various "distinct, maladaptive behaviors," including placing his fingers down his throat to induce vomiting, destroying property by throwing objects, and throwing himself out of his wheelchair. The behavior plans were not entirely consonant with the nursing care plan. For example, none of the behavior plans included in the record required staff to remove all objects from Eric's reach. And the behavior plans did not provide any separate instructions about what to do if Eric uttered "harmful words . . . during behaviors."

Unlike with respect to the nursing care plan, the direct care staff was required to log Eric's progress towards the goals set by the behavior plans twice daily. The frequency of Eric engaging in "maladaptive behaviors" declined while he was at Chapala House, but did not cease. For example, in the 60 days before his death, there were two incidents when he "attempt[ed] to slide out of his [wheelchair] unassisted, followed by

---

[8] The witness specifically referenced the federal Health Insurance Portability and Accountability Act, commonly referred to as HIPAA (42 U.S.C. § 1320d et seq.), which generally provides patients with privacy protections and requires health care providers to limit the disclosure of information.

6

efforts to self-induce vomiting while making harmful statements related to his unhappiness with his physical condition." To have two such incidents in that time period was "consistent with the current frequency of behaviors as charted," and the incidents were not "meaningfully different" in character from earlier incidents.

On November 24, 2012, at approximately 2:38 p.m., Eric "attempted to slide out of his wheelchair while watching television in his room." A direct care staff member then placed Eric on a padded mat in the center of his room, lying on his back. When asked what was wrong, Eric replied "'I don't know. I want to die.'" About five minutes later, Eric used his right hand to cause himself to vomit, and repeated that he wanted to die. He was immediately cleaned by staff, who tried to redirect him. Over the next hour, staff checked on Eric approximately 10 times, including a visit from one staff member between 3:30 and 3:35, and another visit from a different staff member shortly after that. At approximately 3:45 p.m., however, Eric was discovered choking on a small towel or washcloth, which had been left within his reach, and which he had inserted into his mouth while he was alone in his room. CPR was administered, the QIDP was notified, and paramedics were called to take Eric to the hospital, but he later died.

The Department investigated the circumstances of Eric's death, and in October 2013 issued a "Notice of Intent to Issue a Citation and Notice to Correct a Violation." A draft of the citation as it would eventually issue was completed by April 7, 2014, when it was approved by the Department's regional field operations branch chief. On April 8, 2014, a representative of the Department held what the trial court described as a

7

"perfunctory exit conference with a ResCare representative." On April 9, 2014, the district manager of the Department's Riverside district office reviewed and approved the citation. On April 11, 2014, the Department issued and served the citation on ResCare, along with an amended notice of intent to issue a citation.[9]

The citation issued to ResCare was a class AA citation, the most serious category of violation, and was accompanied by a $25,000 civil penalty. (See § 1424, subd. (c).) It stated that ResCare violated two regulations governing Eric's care—California Code of Regulations, title 22, sections 76918, subdivision (a), and 76875, subdivision (a)(2)— when it "failed to ensure [Eric] was free from neglect and protected from self-injurious behavior" by implementing his nursing care plan.[10] More specifically, ResCare had, on the date of Eric's death, failed to ensure that staff (1) immediately reported to the QIDP and RN Eric's "ongoing behavior of self-induced vomiting and stating he wanted to die,"

---

[9] The initial notice, dated October 17, 2013, identified as the basis for the alleged violation only a provision of the Code of Federal Regulations, not the California regulations cited in the amended notice and issued citation.

[10] California Code of Regulations, title 22, section 76918, subdivision (a), provides in relevant part that "[e]ach client shall have those rights as specified in Sections 4502 through 4505 of the Welfare and Institutions Code . . . ." These rights include the "right to be free from harm, including . . . neglect." (Welf. & Inst. Code, § 4502, subd. (b)(8).) California Code of Regulations, title 22, section 76875, subdivision (a), provides in relevant part: "Facilities shall provide registered nursing services in accordance with the needs of the clients for the purpose of [¶] . . . [¶] (2) Development and implementation of a written plan for each client to provide for nursing services as a part of the individual service plan, consistent with diagnostic, therapeutic and medication regimens."

8

(2) removed all objects from Eric's reach during such behavior, and (3) sat Eric upright or on his side "during the episode . . . ."

ResCare brought suit, seeking dismissal or reduction of both the citation and the civil penalty. (See § 1428, subd. (b).) The trial court ruled in the first phase of trial that the Department had met its burden to prove by a preponderance of the evidence the elements to support the issuance of the citation: Eric's nursing care plan had not been followed in several respects, because Eric's behavior was not reported as soon as possible to the QIDP or RN, staff did not position Eric upright to "guard against aspiration," and staff failed to remove all objects from Eric's reach.

In the second phase of trial, the trial court rejected ResCare's argument that the Department had failed to comply with a statutory exit conference requirement. (See § 1423, subd. (a).) The trial court found, however, that ResCare had established the reasonable licensee defense, that is, that it "did what might reasonably be expected of a long-term health care facility licensee, acting under similar circumstances, to comply with the regulation[s]." (§ 1424, subd. (c).) Although the direct care staff members had not followed Eric's nursing care plan in all respects, they had been "attentive to [Eric], complied with his separate, specific behavior plans for the types of maladaptive behaviors manifested, prevented him from aspirating, and took various steps in an attempt to ensure his safety." The trial court found that total compliance with the nursing care plan was not the applicable standard of care, accepted expert testimony presented by ResCare that the direct care staff had "acted reasonably in its care of [Eric] on the day in

9

question," and concluded that "ResCare's conduct through its direct care staff complied with what might reasonably be expected of an ICF/DD-H residence under similar circumstances seeking to comply with the regulations cited." On that basis, the trial court dismissed the citation.

## II. DISCUSSION

### A. *Applicable Law*

The Act allows the Department to cite a long-term health care facility for violations of state or federal laws or regulations relating to such facilities. (§ 1423.) A California long-term health care facility that is issued a citation for a regulatory or statutory violation may challenge that citation by bringing suit. (§ 1428, subd. (b).) It can prevail and have the citation dismissed if (1) the issuing agency fails to prove the factual basis for the citation (§ 1428, subd. (e)), or (2) if the licensee establishes the defense codified in section 1424, subdivision (c), sometimes called the "reasonable licensee defense."

Here, the Department cited ResCare for a class AA violation, which occurs when the violation is "a direct proximate cause of death of a patient or resident of a long-term health care facility." (§ 1424, subd. (c); see *Kizer v. County of San Mateo* (1991) 53 Cal.3d 139, 142 [summarizing the Act's licensing enforcement regime].) Once a class AA citation has been issued, the licensee may challenge it by filing a civil action (after completing certain administrative procedures). (§ 1428, subd. (b).) In such an action, the Department must prove by a preponderance of the evidence that (1) the alleged violation

10

did occur, (2) the alleged violation met the criteria for the class of citation alleged, and (3) the assessed penalty was appropriate. (§ 1428, subd. (e).) Regarding causation, the Department must prove: "(1) The violation was a direct proximate cause of death of a patient or resident"; "(2) The death resulted from an occurrence of a nature that the regulation was designed to prevent"; and "(3) The patient or resident suffering death was among the class of persons for whose protection the regulation was adopted." (§ 1424, subd. (c).)

If the Department meets its burden of proof, the burden then shifts to the licensee to establish the reasonable licensee defense: "If the state department meets this burden of proof, the licensee shall have the burden of proving that the licensee did what might reasonably be expected of a long-term health care facility licensee, acting under similar circumstances, to comply with the regulation. If the licensee sustains this burden, then the citation shall be dismissed." (§ 1424, subd. (c).) The licensee's duty of care is nondelegable, so the defense requires a showing that both "the licensee *and* its agents acted reasonably under the circumstances, despite the fact that regulations were violated." (*California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 299 (*CAHF*).)

The court in *Thompson v. Asimos* (2016) 6 Cal.App.5th 970 explained in detail the standards we apply in reviewing a judgment "based upon a statement of decision following a bench trial . . . ." (*Id.* at p. 981.) We review questions of law de novo, and apply the substantial evidence rule to the trial court's findings of fact. (*Ibid.*) "Under this

11

deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Ibid.*) "It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility." (*Ibid.*) "'A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness.'" (*Ibid.*)

B. *Analysis*

1. *Scope of the Reasonable Licensee Defense*

The Department characterizes the reasonable licensee defense as "a narrow doctrine" that applies to excuse violations of statutory or regulatory violations only where the licensee can show that its noncompliance "was justified due to an emergency or other special circumstances."[11] In the Department's view, special circumstances that would justify noncompliance are limited to "events beyond [the licensee's] control that it could not reasonably have anticipated, or where compliance would create a greater risk of

---

[11] ResCare argues that the Department forfeited its argument regarding the scope of the reasonable licensee defense by failing to raise it in the trial court. The Department contends that it adequately preserved the argument. We conclude that the Department's trial court arguments were sufficient to preserve its challenge to the scope of the reasonable licensee defense, even if its argument on appeal is more fully developed. In any event, to the extent the issue is not well-raised, we exercise our discretion to consider the important legal issue now raised by the Department on the merits, regardless of whether it was raised in the trial court. (See *People v. Williams* (1998) 17 Cal.4th 148, 161, fn.6 ["An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party."].)

harm."[12]  The Department acknowledges that this limitation does not appear in the text of the reasonable licensee defense, arguing instead that the interpretation "has been developed through case law in which the Supreme Court has examined the purpose and history of the provision, and the negligence per se doctrine upon which it is based . . . ."  We agree that such case law is relevant to the analysis, but disagree with the Department's interpretation of it.

There is only one published appellate opinion directly addressing the scope of the reasonable licensee defense, which was first added to the Act in 1985.  (See *CAHF, supra*, 16 Cal.4th at p. 292.)  In *CAHF,* our Supreme Court considered whether the defense "was intended to relieve licensees of vicarious liability for their employees" who acted unreasonably.  (*Id.* at p. 288.)  In other words, to establish the defense, did the licensee only have to prove that *it* acted reasonably, or did it also have to establish the reasonableness of its employees' actions?  As noted above, the Supreme Court held that to establish the defense the licensee must prove that both "the licensee *and* its agents acted reasonably under the circumstances, despite the fact that regulations were violated." (*Id.* at p. 299.)

---

[12]  At least, this is the interpretation the Department proposes in its opening brief. In reply briefing, the Department frames the issue somewhat differently, recognizing that there are "a wide variety of scenarios that could conceivably justify or excuse [ResCare's] failure to implement Eric's nursing care plan," but arguing that there is no evidence that "indicates a basis to excuse or justify [ResCare's] failure to follow each of the three parts of Eric's nursing care plan."  Even in its reply brief, however, the Department apparently would limit acceptable excuses or justifications to circumstances of "emergency, incapacity, or danger to others."

In reaching its holding in *CAHF*, the Supreme Court observed that the language of the reasonable licensee defense was adapted from Evidence Code section 669, subdivision (b)(1). (*CAHF, supra*, 16 Cal.4th at p. 297.) "That subdivision provides that a presumption of negligence per se, which arises under subdivision (a) of that provision when a person violates a statute, ordinance, or regulation of a public entity which proximately causes the injury or death to a property or person, may be rebutted by proof that '[t]he person violating the statute, ordinance, or regulation did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law.'" (*Ibid.*) Evidence Code section 669 is "itself a codification of the common law [citation]." (*CAHF*, 16 Cal.4th at p. 297.) Case law regarding Evidence Code section 669 and the common law doctrine of negligence per se is therefore instructive in determining the scope of the reasonable licensee defense.

In briefing, the Department relies primarily on a single Court of Appeal case interpreting Evidence Code section 669 and the doctrine of negligence per se, *Casey v. Russell* (1982) 138 Cal.App.3d 379 (*Casey*). *Casey* arose out of a collision between two cars on a narrow, winding mountain road; the collision injured a passenger of one of the cars, who sued both drivers. (*Id.* at pp. 381-382.) The largely undisputed facts implicated two Vehicle Code statutes, one that required drivers to drive entirely on the right half of the road unless the road was too narrow to do so, and another that required drivers on mountain roads to sound the horn when approaching a blind curve if the road is too narrow for two cars to pass. (*Casey*, *supra*, at p. 382.) Neither driver had sounded

14

his horn or attempted to do so when approaching the blind curve where the accident occurred, and one of the drivers was not entirely on the right half of the road when the cars collided. (*Ibid.*) Thus, in the plaintiff's view, "the jury could have believed only one of two things: either the road was wide enough for two cars, or it was not. If the jury believed the road was wide enough for two cars, then [one of the drivers] admittedly violated a statute by driving in the middle of the road. If the jury believed that the road was too narrow for two cars to pass, then both defendants violated the statute requiring them to sound their horns." (*Id.* at p. 383.) Nevertheless, after a trial, the jury returned a verdict in favor of both defendants. (*Id.* at p. 382.)

The Court of Appeal in *Casey* reversed, finding that the jury instruction given on the issue of negligence per se did not "adequately convey that there must be some special circumstances which justify violating the statute." (*Casey, supra*, 138 Cal.App.3d at p. 385.) The instruction as given was ambiguous, and could be read to permit the jury to return a defense verdict based on a finding that "generally law-abiding people of ordinary prudence do not sound their horns on blind curves, or would have driven in the middle of the road (i.e., nobody observes the statute), and that defendants were therefore not

15

negligent."[13] (*Id.* at p. 385.) The Court of Appeal held that the phrase "'who desired to comply with the law'" in Evidence Code section 669 "does not mean one who in general is a law-abiding person, but rather refers to one who, although he desired to comply with the particular statute in issue, was faced with other circumstances which prevented compliance or justified noncompliance." (*Casey*, *supra*, at p. 385.)

In reaching its holding, the Court of Appeal in *Casey* quoted examples from the Restatement Second of Torts of "the types of situations which may justify or excuse a violation of the statute," and summarizes them as follows: "Thus, in emergencies or because of some unusual circumstances, it may be difficult or impossible to comply with the statute, and the violation may be excused."[14] (*Casey*, *supra*, 138 Cal.App.3d at p. 384.) We do not, however, understand either the list of examples or the Court of Appeal's summary of them to be intended to encompass all situations in which a statutory or regulatory violation may be excused under Evidence Code section 669 or the common

---

[13] The instruction at issue in *Casey* was the following: "'If you find that a party to this action violated §§ 21650 or 21662 of the Veh. Code, the [statute] just read to you [and that such violation was a proximate cause of injury to another or to himself], you will find that such violation was negligence [unless such party proves by a preponderance of the evidence that he did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law].' (BAJI No. 3.45, as modified.)" (*Casey, supra*, 138 Cal.App.3d at p. 384.)

[14] The Restatement's examples are the following: "(a) the violation is reasonable because of the actor's incapacity; [¶] (b) he neither knows nor should know of the occasion for compliance; [¶] (c) he is unable after reasonable diligence or care to comply; [¶] (d) he is confronted by an emergency not due to his own misconduct; [¶] (e) compliance would involve a greater risk of harm to the actor or to others." (Rest.2d Torts, § 288A; see *Casey, supra*, 138 Cal.App.3d at p. 384.)

law doctrine of negligence per se, as the Department proposes. Indeed, comments to the quoted Restatement section specify that "[t]he list of situations in which a violation may be excused is not intended to be exclusive. There may be other excuses." (Rest.2d Torts, § 288A, com. a.)

Our reading of *Casey* is informed by the California Supreme Court's opinion in *Alarid v. Vanier* (1958) 50 Cal.2d 617 (*Alarid*), from which the language of Evidence Code section 669 was derived. (See Cal. Law Revision Com. com., West's Ann. Cal. Evid. Code (2019 ed.) foll. § 669 [citing *Alarid*].) In *Alarid*, the Supreme Court discussed the common law doctrine of negligence per se, noting that "[t]he presumption of negligence which arises from the violation of a statute is rebuttable and may be overcome by evidence of justification or excuse." (*Alarid, supra*, at p. 617.) The Court observed that the rule to be applied in determining whether the person who violated a statute had overcome the presumption had been articulated in several different ways. (*Id.* at pp. 622-624.) It articulated the "correct test" as follows: "whether the person who has violated a statute has sustained the burden of showing that he did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law." (*Id.* at p. 624.) It expressly disapproved cases that "stated or indicated that justification or excuse for violation of a statute can be found only in causes or things 'beyond the control of the person charged with the violation.'" (*Id.* at pp. 622, 624.) It also expressly disapproved an instruction, endorsed by some appellate opinions, that "the jury may assume that a person of ordinary prudence will reasonably

17

endeavor to obey the law and will do so unless causes, not of his own intended making, induce him, without moral fault, to do otherwise." (*Id.* at pp. 623-624.)

Together, the authority discussed above requires that we reject the Department's interpretation of the reasonable licensee defense. *CAHF* confirms that case law regarding the common law of negligence per se and Evidence Code section 669 should inform our analysis. (*CAHF, supra*, 16 Cal.4th at p. 297.) *Alarid* teaches that the licensee need not necessarily prove there was an emergency or other special circumstance beyond its control to overcome the presumption of negligence per se arising from a regulatory violation. (*Alarid, supra*, 50 Cal.2d at p. 622-624.) Rather, the question is whether, under *similar* circumstances (no matter whether those circumstances are unusual or not), the licensee did what might reasonably be expected of a licensee that desires to comply with the law. (*Ibid.*)

*Casey* clarifies that a reasonable licensee in this context is not one "who in general is a law-abiding person," but rather one who "desired to comply with the particular statute in issue," or in this case, the regulation at issue.[15] (*Casey, supra*, 138 Cal.App.3d at p. 385.) This is a critical point. The Department in its briefing tends to view the appropriate legal standard as a binary choice between its favored emergency/special circumstance requirement and a standard of "ordinary negligence." But the statutory

---

[15] Section 1424 is less ambiguous in this respect than Evidence Code section 669, referring to a licensee who did what might reasonably be expected "to comply with *the regulation*," rather than the fuzzier language "who desired to comply with the law." (Compare § 1424, subd. (c), italics added, with Evid. Code, § 669, subd. (b).)

18

standard that we hold applies is one of reasonable care by a person "who desired to comply with the law." (*Alarid*, *supra*, 50 Cal.2d at p. 624; § 1424, subd. (c) ["to comply with the regulation"].) This difference is significant because it does not permit an argument that the law is a bad one, or that it can be disregarded or overlooked, so long as the licensee exercised care. Rather, the licensee must demonstrate that it exercised reasonable care in desiring to comply with the regulation.

In the context of a simple statutory violation, such as the traffic laws at issue in *Casey*, it may well be that—in practice—the circumstances in which a person could violate the law, yet nevertheless be found to have done what might reasonably be expected of an ordinary person who desired to comply with the law, would be unusual circumstances such as emergencies. It would have to be a true emergency, for example, for an automobile driver exercising due care in complying with the law to be justified in speeding through a red light. But the legal standard for regulatory violations such as the ones at issue here is far more nuanced. As to these violations, there is no unique way to comply with the law, nor are particular actions banned (though one can imagine actions that are unreasonable in almost any context). One of the two alleged violations here was of Eric's right to be free from harm, including neglect. (Cal. Code Regs., tit. 22, § 76918, subd. (a); Welf. & Inst. Code, § 4502, subd. (b)(8).) The other was the more specific requirement of developing and implementing Eric's written nursing services plan. (Cal. Code Regs., tit. 22, § 76875, subd. (a).) The Department arguably established a basis for the citation here by showing that Eric's death resulted from a foreseeable event that might

19

have been avoided by a well-developed and implemented nursing plan. But such a citation raises a range of questions that have no analogy in the traffic-law context. Did the plan reasonably cover all of the foreseeable harms to Eric? Was the plan's manner of addressing those harms reasonable? Was the plan adequately communicated to the direct care staff? Did the direct care staff implement the plan's requirements adequately? For example, if they were required to check on Eric, was the frequency of their doing so reasonable? The nature of such a regulatory violation allows for situations in which parties could fairly dispute, including with expert testimony, whether the licensee's actions constituted what might reasonably be expected of an ordinary licensee who desired to comply with the regulations, acting in similar circumstances. That is, to put it bluntly, Eric's death may have occurred despite ResCare doing what might reasonably be expected of a long-term health care facility acting with ordinary prudence, in similar circumstances, that desired to comply with the law.

The Department argues that the history of legislative amendments to section 1424 supports its interpretation of the reasonable licensee defense, discerning a "pattern of strengthening the Department's enforcement authority and citation penalties," and an intent to preserve the reasonable licensee defense "only to the extent that it did not adversely impact the Department's enforcement of the regulations governing patient safety." It is not apparent, however, that this history cuts in favor of the Department. The Legislature could have added an express limitation of the sort advocated by the Department to the statutory language of section 1424, but it chose not to do so. "It is not

20

the role of the courts to add statutory provisions the Legislature could have included, but did not." (*Artus v. Gramercy Towers Condominium Assn.* (2018) 19 Cal.App.5th 923, 945; see *City of Scotts Valley v. County of Santa Cruz* (2011) 201 Cal.App.4th 1, 32 [where statutory language is unambiguous, "the plain meaning governs and it is unnecessary to resort to extrinsic sources to determine legislative intent"].) The Legislature's expectation that the defense "will be applicable in only a relatively small number of cases" and will have "relatively little impact" on the Department's regulatory enforcement efforts has little to do with whether the trial court erred in finding it applicable in this particular case. (See *CAHF, supra*, 16 Cal.4th at p. 303.)

In sum, the correct test for the reasonable licensee defense is the one given by the statutory language: whether the licensee, even though it violated a regulation, "did what might reasonably be expected of a long-term health care facility licensee, acting under similar circumstances, to comply with the regulation." (§ 1424, subd. (c).) We reject the additional, non-statutory limitations proposed by the Department. Certainly, evidence that the violation was the result of events beyond the licensee's control that it could not reasonably have anticipated, or evidence that compliance would have created a greater risk of harm, is relevant to whether the licensee did what might reasonably be expected of a licensee, acting in similar circumstances, to comply with the regulation. But neither the statutory language, nor the relevant case law, necessarily requires the licensee to prove such circumstances to establish the defense.

## 2. *Trial Court's Ruling*

The trial court found that the citation issued by the Department should be dismissed because ResCare established the reasonable licensee defense. Viewed in the deferential light required, this finding is supported by substantial evidence.

In the Department's view, Eric's nursing care plan essentially has the same force of law for the Chapala House direct care staff as the Vehicle Code provisions at issue in *Casey*, which required that a driver keep to the right half of a road where the road is not too narrow to do so, and sound the horn when approaching a blind curve. But this oversimplifies the analysis. The provisions of the nursing care plan itself are not regulatory or statutory requirements; rather, the relevant regulations and statutes require that ResCare "develop[]" and "implement[]" a nursing care plan, and that the client not be subjected to "neglect." (Cal. Code Regs., tit. 22, §§ 76918, subd. (a), 76875, subd. (a)(2); Welf. & Inst. Code, § 4502, subd. (b)(8).) Strictly speaking, then, our question is not whether Chapala House direct care staff had an acceptable reason for failing to perform the nursing care plan exactly as written, as the Department frames it. Rather, our question is whether substantial evidence supports the trial court's conclusion that ResCare's efforts to implement the nursing care plan that had been developed, and to provide Eric with care that did not amount to neglect, were consistent with what might reasonably be expected of a licensee acting in similar circumstances.

With respect to neglect, there is no dispute that the trial court's conclusion was supported by substantial evidence. The trial court found "overwhelming evidence" that

22

ResCare had met the applicable standard of care, established by expert testimony, observing that "the staff acted reasonably in its care of [Eric] on the day in question" in that it "was attentive to [Eric], complied with his separate specific behavior plans for the types of maladaptive behaviors manifested, prevented him from aspirating, and took various steps in an attempt to ensure his safety." In this appeal, the Department has not contended that Eric was neglected in a general sense, focusing instead on the direct care staff's compliance with the nursing care plan.

We also find that substantial evidence supports the trial court's conclusion that, even though Chapala House direct care staff did not implement Eric's nursing care plan perfectly, they did what might reasonably be expected of staff, acting in similar circumstances, who desired to implement its requirements. As written, the nursing care plan requires staff to exercise considerable judgment with respect to determining whether Eric was "in behavior," in determining which parts of the plan of care to prioritize, and in interpreting ambiguous or vague aspects of the nursing care plan. For example, it was at least arguably reasonable for staff to prioritize attempts to calm and redirect Eric—and after he was discovered to have vomited, to clean him—over immediately calling the RN and QIDP to inform them that Eric had become agitated and made concerning statements. This is particularly true given that staff complied with guidelines for calling the RN and QIDP in the overlapping behavior plan that applied when Eric induced himself to vomit, which required staff to make such a call only if the behavior continued for more than 10 minutes. We cannot say that the trial court's finding—that, to the extent the staff violated

23

the nursing care plan by failing to call the RN and QIDP "ASAP," their actions were nevertheless consistent with what might reasonably be expected, under similar circumstances, of a staff that desired to implement the nursing care plan—was unsupported by substantial evidence.

In a similar vein, the nursing plan calls for Eric to be placed in an upright position or on his side "during any form of inducing of vomiting during his behavior." When Eric was initially placed on his back on a pad, he had slid out of his wheelchair, but he had not yet attempted to induce vomiting. A short time later, staff discovered that Eric had vomited while he was alone in his room. A fair reading of the evidence, however, is that staff never placed or left Eric on his back *while* he was vomiting or attempting to induce vomiting. We find no lack of substantial evidence in support of the trial court's conclusion that ResCare established the reasonable licensee defense in relation to staff's implementation of this provision of the nursing care plan, to the extent there was any violation of the plan at all.

Finally, there is some evidence that the direct care staff who cared for Eric after he vomited tried to "remove all objects around [him]" as required by the nursing care plan. One of the staff members recalled that, while she was mopping and cleaning up around Eric, she tried "to make sure nothing was around him," and recalled specifically that she moved his shoes and a sock. The other testified that, after she used a wash cloth or towel to clean up Eric, she left it on the floor by the door of Eric's room, well out of his reach, and that she did not see any objects in Eric's immediate vicinity that she thought Eric

24

might be able to grab. To be sure, these efforts to remove objects from Eric's reach were unsuccessful, and this failure was ultimately fatal to Eric. Nevertheless, we cannot say that there is no substantial evidence in support of the trial court's conclusion that the direct care staff did what might be reasonably expected, under similar circumstances, to try to implement the nursing care plan's directive to remove objects from around Eric.

It gives us some pause that, in depositions and at trial, the direct care staff members testified that they were not familiar with the nursing care plan as a document. Nevertheless, it is not beyond the bounds of reason to conclude that a nursing care plan could be implemented by training the direct care staff members in its provisions, rather than providing them with the document itself. There was expert testimony that it would be "highly unusual" in the industry for the direct care staff to "actually see the document." We also observe that the nursing care plan is, at least arguably, not written or formatted in a manner conducive to operational use. From the patient's perspective, it no doubt matters most that the document's substance was communicated to staff in whatever manner would be most effective for training purposes.

In short, on the record and evidence presented, we find that substantial evidence supports the trial court's conclusion that both ResCare as a licensee and its agents, the direct care staff who interacted with Eric, "did what might reasonably be expected of a long-term health care facility licensee, acting under similar circumstances, to comply" with the regulations that the Department cited ResCare with violating. (See § 1424, subd.

(c).)  The Department has not demonstrated that we should disturb the trial court's

judgment.[16]

## III.  DISPOSITION

The judgment is affirmed.  ResCare is awarded costs on appeal.

CERTIFIED FOR PUBLICATION


RAPHAEL_____
J.


We concur:

MILLER_____
            Acting P. J.
MENETREZ_____
                        J.

---

[16] In light of our conclusions regarding the trial court's application of the reasonable licensee defense, we need not and do not resolve the parties' dispute relating to the statutory exit conference requirement.  (See § 1423, subd. (a).)